1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

16

DZ BANK AG DEUTSCHE
ZENTRAL-
GENOSSENSCHAFTSBANK,

                    Plaintiff,

        v.

CONNECT INSURANCE AGENCY,
INC.,

                    Defendant.

CASE NO. C14-5880JLR

ORDER ON CROSS MOTIONS
FOR SUMMARY JUDGMENT

## I.     INTRODUCTION

Before the court are:  (1) Plaintiff DZ Bank AG Deutsche Zentral-

Genossenschaftsbank's ("DZ Bank") motion for summary judgment (DZ Mot. (Dkt.

## 64 (redacted), 66 (sealed)), and (2) Defendant Connect Insurance Agency, Inc.'s

("Connect's") motion for summary judgment (Con. Mot. (Dkt. ## 73 (redacted), 74

(sealed)).  The court has considered the motions, all submissions filed in support thereof

1 and opposition thereto, the balance of the record, and the applicable law.  In addition, the

2 court heard the argument of counsel on February 10, 2016.  Being fully advised, the court

3 GRANTS in part and DENIES in part DZ Bank's motion and DENIES Connect's motion

4 as more fully described below.

## II.    BACKGROUND

6 DZ Bank is a bank registered under the laws of the Federal Republic of Germany,

7 and it maintains a place of business in New York, New York.  (Probst Aff. (Dkt. # 65)

8 ¶ 4.)  Connect is a Texas corporation with its principal place of business in Texas and

9 also a Florida corporation with its principal place of business in Florida.  (Am. Ans. (Dkt.

10 # 10) ¶ 65.)  Connect is registered to do business in Washington.  (DZ Mot. Ex. A (Dkt. #

11 64-1).)[1]  On November 11, 2014, DZ Bank sued Connect for conversion and unjust

12 enrichment for allegedly taking collateral belonging to DZ Bank without DZ Bank's

13 consent and without compensating DZ Bank.  (See Compl. (Dkt. # 1).)  The court details

14 the complex financial background that lead to the current dispute below.

### A. DZ Bank's Security Interest in Loans by BCC

16 On August 27, 2004, Brooke Credit Company ("BCC"), as seller, entered into a

17 Sale and Servicing Agreement with Brooke Credit Funding, LLC ("BCF"), as buyer and

18 issuer, and Textron Business Services, Inc., as initial servicer.  (See Probst Aff. ¶ 10.)

---

[1] DZ Bank requests that the court take judicial notice of filings with Washington State's Secretary of State, which DZ Bank attaches to its motion as Group Ex. A.  (DZ Mot. at 2 n.2.)  The court agrees that it may take judicial notice of these documents.  *See Grassmueck v. Barnett*, 281 F. Supp. 2d 1227, 1232 (W.D. Wash. 2003) (holding that the court may take judicial notice of public records kept by the Secretary of State).

1   The Sale and Servicing Agreement provided for the transfer of various loans then payable

2   to BCC by third parties ("the Sales Agreement"). (*See id*.)  The Sale and Servicing

3   Agreement also provided for the transfer of then-future loans from BCC to BCF upon the

4   agreement of the two parties.  (*Id*.)  On the same day, BCF, as borrower, entered into a

5   Credit and Security Agreement with BCC, as seller, and Brooke Corporation, as servicer

6   and guarantor, Autobahn Funding Company, LLC ("Autobahn"), as lender, and DZ

7   Bank, as agent for Autobahn.  (*Id*.)  The Credit and Security Agreement obligated

8   Autobahn to finance BCF's acquisition of the various loans under the Sales Agreement.

9   (*Id*.)

10       On August 29, 2006, BCF, as borrower, BCC, as seller, Brooke Corporation, as

11  subservicer and guarantor, Autobahn, as lender, and DZ Bank, as agent for Autobahn,

12  entered into an Amended and Restated Credit and Security Agreement ("the Amended

13  Security Agreement").  (*Id*. ¶ 11, Ex. 1 (attaching the Amended Security Agreement); *see*

14  *also* Con. Mot. at 2 (acknowledging this agreement in paragraph designated 2.4).)  Under

15  the Amended Security Agreement, Autobahn agreed to loan certain funds to BCF for

16  BCF's purchase of various loans from BCC under the Sale Agreement.  (Probst Aff. ¶ 12,

17  Ex. 1 ¶ 2.04.)

18       To secure BCF's obligations to Autobahn under the Amended Security

19  Agreement, BCF granted DZ Bank, as Autobahn's agent, a security interest in:  (1) all of

20  its rights, title, and interest in and to various loans that BCF had already purchased from

21  BCC under the Sale Agreement; (2) all of its rights, title, and interest in and to various

22  loans that BCF would purchase from BCC in the then-future under the Sale Agreement;

1  and (3) various other collateral.  (*Id.* ¶ 13, Ex. 1 ¶¶ 2.12-.13; *see also* Am. Ans. ¶ 78

2  ("Unbeknownst to the Franchisees, Brooke had pledged the notes as security for loans

3  from DZ Bank, which funded the purchases of the franchises.").)  DZ Bank perfected its

4  security interest in the Amended Security Agreement by filing Uniform Commercial

5  Code ("UCC") Financing Statements against BCC and BCF.  (*Id.* ¶ 14, Ex. 2.)

6  **B.   BCC Finances Advantage Pacific's Purchase of an Insurance Agency**

7  On February 26, 2008, Advantage Pacific Insurance, Inc. ("Advantage Pacific"),

8  as purchaser, entered into an Agreement for Purchase of Agency Assets ("Advantage

9  Purchase Agreement") with Insurance Express Services, Inc. and Robert Spruill, as

10  sellers (collectively, "Seller").  (*Id.* ¶ 15, Ex. 3.)  The Advantage Purchase Agreement

11  obligated Seller to transfer substantially all of the Seller's assets for two Brooke

12  Insurance franchises, including Seller's book of business, customer accounts, and all

13  other intangible assets (the "Advantage Agency Assets"), in exchange for $235,346.00.

14  (*Id.* ¶ 15, Ex. 3; *see also* Con. Mot. at 3 (acknowledging this agreement in the paragraph

15  designated 2.9).)

16  On February 29, 2008, BCC, as lender, and Advantage Pacific, as borrower,

17  entered into a Promissory Note known as Loan No. 6852 and an Agreement for

18  Advancement of Loan (collectively, "Advantage Note"), in which BCC agreed to loan

19  Advantage Pacific $230,287.00 toward Advantage Pacific's purchase of the Advantage

20  Agency Assets under the Advantage Purchase Agreement.  (*Id.* ¶ 16, Ex. 4; *see also* Am.

21  Ans. ¶ 75 ("In February 2008, Advantage Pacific paid $5,000 cash, pledged his existing

22  book of business, which Brooke valued at approximately $160,000 and agreed to sign a

note in the amount of $230,287.00.").) David Coley guaranteed Advantage Pacific's obligation under the Advantage Note pursuant to a guaranty ("Advantage Guaranty").[2] (Probst Aff. ¶ 17, Ex. 5.)

To secure Advantage Pacific's obligations under the Advantage Pacific Note, Advantage Pacific granted BCC a blanket security interest in all of Advantage Pacific's personal property, including the Advantage Agency Assets, client accounts and rights to payment, and all proceeds therefrom (collectively, "Advantage Collateral"), pursuant to a commercial security agreement ("Advantage Security Agreement"). (*Id.* ¶ 18, Ex. 6.) The Advantage Collateral includes general intangibles, which includes client lists. (*Id.* Ex. 6 at 1.)

Pursuant to the loan documents executed by Advantage Pacific, BCC paid $230,287.00 to Seller toward Advantage Pacific's purchase of the Advantage Agency Assets. (*Id.* ¶ 19.) In accord with the Bill of Sale under the Advantage Purchase Agreement, and in exchange for the purchase price of $235,346.00, Seller transferred all of its right, title, and interest in and to the Advantage Agency Assets to Advantage Pacific. (*Id.*; *see also id.* ¶ 16, Ex. 4.) BCC perfected its security interest in the Advantage Collateral by filing a Uniform Commercial Code ("UCC") Financing Statement ("Advantage Financing Statement") with the Washington Secretary of State. (*Id.* ¶ 20, Ex. 7.)

---

[2] While Advantage Pacific was operating, Mr. Coley was its sole owner and officer. (Fullmer Decl. (Dkt. ## 75-79) Ex. F ("Coley Dep.") at 17:3-9.)

1    On February 29, 2008, contemporaneously with BCC and Advantage Pacific's

2 execution of the Advantage Note, BCF sent a Borrowing Base Certificate to DZ Bank.

3 (*Id.* ¶ 21, Ex. 8.)  In this Certificate, BCF requested that Autobahn advance funds to BCF

4 under the Amended Security Agreement for BCF's purchase of the Advantage Note and

5 various other loans.  (*Id.*)  Under the Amended Security Agreement, on or about February

6 29, 2008, Autobahn loaned BCF $230,287.00 to purchase the Advantage Note from

7 BCC.  (*Id.* ¶ 22.)  In conjunction with this, BCC assigned the Advantage Note to BCF,

8 and the Advantage Note, Advantage Guaranty, and Advantage Security Agreement

9 became immediately subject to DZ Bank's lien under the Amended Security Agreement.

10 (*Id.* ¶ 22, Ex. 1 ¶¶ 2.12-2.13.)

11    **C.    BCC Finances API's Purchase of an Insurance Agency**

12    On October 31, 2007, BCC, as lender, and CrullADD, Inc., as borrower, entered

13 into a Promissory Note known as Loan No. 6486 and an Agreement for Advancement of

14 Loan (collectively, "Note 6486"), in which BCC agreed to loan CrullADD $962,208.42

15 toward CrullADD's refinance of existing BCC debt.  (*Id.* ¶ 23, Ex. 9.)

16    On October 31, 2007, contemporaneously with BCC and CrullADD entering into

17 Note 6486, BCF sent a Borrowing Base Certificate to DZ Bank.  (*Id.* ¶ 24, Ex. 10.)  In

18 this Certificate, BCC requested that Autobahn advance funds to BCF under the Amended

19 Security Agreement for BCF's purchase of Note 6486 and various other loans.  (*Id.* ¶ 24,

20 Ex. 10.)  Under the Amended Security Agreement, on or about November 1, 2007,

21 Autobahn loaned BCF $962,208.42 to purchase Note 6486 from BCC.  (*Id.* ¶ 25.)  BCC

22

1   assigned Note 6486 to BCF, and Note 6486 became immediately subject to DZ Bank's

2   lien under the Amended Security Agreement.  (Id. ¶ 25, Ex. 1 ¶¶ 2.12-2.13.)

3       On June 27, 2008, API Vancouver Insurance, Inc. ("API"), as assignee, and BCC,

4   as secured creditor and assignor, entered into a Bill of Sale and Instrument of

5   Conveyance in Foreclosure ("API Bill of Sale")[3] for the transfer to API of all collateral

6   secured by BCC pursuant to Note 6486 in exchange for the purchase price of

7   $350,000.00.[4]  (Id. ¶ 26, Ex. 11.)  This collateral included substantially all of the assets of

8

---

9   [3] Connect objects to the admission of the API Bill of Sale.  (Con. Resp. (Dkt ## 91
10  (redacted), 94 (sealed)) at 3.)  Connect argues that the exhibit should be excluded because DZ
    Bank's Federal Rule of Civil Procedure 30(b)(6) witness, Mr. Probst, testified that he "could not
11  recall ever seeing an agreement to purchase agency assets" for the API transaction, and Connect
    relied on this testimony to conclude that no such document existed.  (Id. citing 12/9/15 Fullmer
12  Decl. (Dkt. # 75) Ex. A ("Probst Dep.") at 325:8-326:17).)  Connect argues that DZ Bank may
    not now introduce evidence contrary to its Rule 30(b)(6) deponent's statement.  (Id.)  However,
13  as DZ Bank points out, Mr. Probst's testimony was accurate.  (See DZ Reply (Dkt. ## 101
    (redacted), 102 (sealed)) at 5.)  Connect's counsel asked whether Mr. Probst had seen an
14  "agreement to purchase agency assets" between CrullADD and API like the one "between Mr.
    Spruill, Insurance Express, and Advantage Pacific."  (Probst Dep. at 325:5-326:10.)  The API
15  Bill of Sale was between BCC and API and it had a different title than the "Agreement for
    Purchase of Agency Assets" for Advantage Pacific.  (Compare Probst Aff. ¶ 26, Ex. 11 (titled:
16  "Bill of Sale and Instrument of Conveyance in Foreclosure") with id. ¶ 15, Ex. 3 (titled:
    "Agreement for Purchase of Agency Assets").)  Thus, Connect's reliance on Mr. Probst's
    testimony to conclude that no API Bill of Sale existed is misplaced.  Further, Connect's reliance
17  "on the absence of any such document in the record" is also misplaced.  Connect failed to timely
    serve its requests for written discovery, and the court granted DZ Bank's motion for a protective
18  order.  (See Min. Entry (Dkt. # 53).)  Thus, Connect cannot "rely" upon DZ Bank's failure to
    produce the document when the court precluded Connect's discovery due to its untimeliness.
    The court, therefore, overrules Connect's objection to the admission of the API Bill of Sale.
19
    [4] Connect asserts that Mr. Coley "did not complete the transaction" to purchase the API
20  Agency Assets.  (Con. Mot. at 4 (citing Coley Dep. at 11:19-12:4).)  In his deposition, Mr. Coley
    testified as follows:
21
        Q:  And then you had a second company named API Vancouver Insurance?
        A:  Yes.
22      Q:  Okay.  And what did that do?

ORDER- 7

1 | CrullADD doing business as Brooke Insurance Franchise No. 948, including the agency's

2 | book of business ("API Agency Assets"). (*Id.*) On the same day, BCC, as lender, and

3 | API, as borrower, entered into an Amendment to Promissory Note whereby API assumed

4 | all of CrullADD's obligations pursuant to Note 6486 by Assumption Agreement dated

5 | June 27, 2008, and wherein the principal loan balance was amended to $350,000.00

6 | (collectively, "Amended Note 6486").[5] (*Id.* ¶ 27, Ex. 12.) Mr. Coley guaranteed API's

7 | obligations under Amended Note 6486 pursuant to a guaranty ("API Guaranty").[6] (*Id.*

8 | ¶ 28, Ex. 13.)

9

10

---

A: Brooke Insurance informed me I had to form a second corporation in order to purchase another agency they offered me. And I think it was July of 2008. And then we began the process. It drug on for a long time. It never really completed because we filed bankruptcy in October so we never really got there.
Q: And – in October of 2008?
A: Yeah. That's when I found out they had gone out of business, because there was actually nothing – they were selling just paper, basically.

(Coley Dep. at 11:15-12:4.) Although this testimony is equivocal, Connect provides no evidence to the court that Mr. Coley denies executing the API Bill of Sale, the personal guarantee, or the API Security Agreement.

[5] Connect argues that the doctrine of judicial estoppel precludes DZ Bank from asserting "that the CrullADD/API sale was a foreclosure sale," because in the litigation DZ Bank filed against Advantage Pacific, API, and Mr. Coley in the United States District Court for the Western District of Washington, No. C11-5879BHS ("Advantage/API Case"), DZ Bank "alleged that it was a holder in due course and made no mention of this foreclosure sale." (Con. Resp. at 3.) However, the court finds no inconsistency between DZ Bank's position in the previous litigation and its position here. API's acquisition of the API Agency Assets formerly owned by CrullADD never altered the continuity of the pledge of Note 6486 to DZ Bank, where API assumed Note 6486 by the Assumption Agreement, and Amended Note 6486 was automatically subject to DZ Bank's lien under the Amended Security Agreement based upon DZ Bank's interest in Note 6486. (*See* Probst Aff. ¶¶ 23-31.)

[6] While API was operating, Mr. Coley was the sole owner and officer of the company. (Coley Dep. at 17:3-9.)

1    To secure API's obligations under Amended Note 6486, API granted BCC a

2  blanket security interest in all of API's personal property, including the API Agency

3  Assets, client accounts and rights to payment, and all proceeds therefrom (collectively,

4  "API Collateral"), pursuant to a commercial security agreement ("API Security

5  Agreement"). (*Id.* ¶ 29, Ex. 14.) BCC, d/b/a Aleritas, perfected its security interest in the

6  API Collateral by filing a UCC Financing Statement ("API Financing Statement") with

7  the Washington Secretary of State. (*Id.* ¶ 30, Ex. 15.) Amended Note 6486, the API

8  Guaranty, and the API Security Agreement became immediately subject to DZ Bank's

9  lien under the Amended Security Agreement based upon DZ Bank's interest in Note

10  6486. (*Id.* ¶ 30, Ex. 1 ¶¶ 2.12-2.13.)

11    **D. DZ Bank Forecloses on its Security Interest in the Advantage and CrullADD Notes and Security Agreements**

12

13    In or about October 2008, BCF defaulted on its obligations to DZ Bank under the

14  Amended Security Agreement. (*Id.* ¶ 32.) On October 30, 2008, DZ Bank, BCC, and

15  BCF entered into a Surrender of Collateral, Consent to Strict Foreclosure, Release and

16  Acknowledgement Agreement ("Surrender of Collateral"). (*Id.* ¶ 32, Ex. 16.) The

17  Advantage Note and Amended Note 6486 (collectively, "Notes"), as well as the

18  Advantage Security Agreement and API Security Agreement (collectively, "Security

19  Agreements") are included in the Surrender of Collateral. (*Id.* ¶ 32, Ex. 17 ¶¶ B-C, 1.2;

20  Ex. 16 (Annex 1).) Under Section 1.3.1. and other provisions of the Surrender of

21  Collateral, DZ Bank has full ownership of the Notes and Security Agreements. (*Id.* ¶ 32,

22  Ex. 16.) On October 31, 2008, DZ Bank and BCF entered into an Omnibus Assignment

1   under which BCF further confirmed that DZ Bank has full ownership of BCF's rights as

2   BCC's assignee under the Notes and Security Agreements.  (*Id.* ¶ 33, Ex. 17.)

3        In conjunction with the Surrender of Collateral and Omnibus Assignment, BCF

4   executed an Allonge to Promissory Note, whereby BCF endorsed Promissory Note 6852

5   and made it payable to DZ Bank.  (*Id.* ¶ 34, Ex. 4.)  BCF then surrendered the original

6   Notes, including Note 6486, and the original Security Agreements to DZ Bank, and DZ

7   Bank remains in possession of the originals.  (*Id.*)  To further demonstrate DZ Bank's

8   interest in the Advantage Note, BCC's Financing Statement was amended on April 14,

9   2008, to include DZ Bank as the secured party ("Amended Advantage Financing

10  Statement").  (*Id.* ¶ 35, Ex. 18.)  The court will refer collectively to the Advantage

11  Financing Statement, the Amended Advantage Financing Statement, and the Advantage

12  Security Agreement as the "Advantage Security Interest."

13       **E.  Connect Acquires the Advantage Collateral Secured by DZ Bank**

14       Mr. Coley was the sole owner and operator of Advantage and API.  (Coley Dep. at

15  17:3-9.)  After opening Advantage Pacific and acquiring the Advantage Agency Assets

16  through BCC, Mr. Coley formed API for the purpose of acquiring the API Agency Assets

17  from BCC.  (*Id.* at 11:11-22.)

18       Following the Surrender of Collateral and Omnibus Assignment, Brooke

19  Corporation and Brooke Capital Corporation filed for Chapter 11 bankruptcy on October

20  28, 2008, in the Bankruptcy Court for the District of Kansas, Case No. 08-22789.  (*See*

21  Am. Ans. ¶ 94 ("[I]n October 2008, Brooke Corporation and Brooke Capital declared

22  Chapter 11 bankruptcy and suspended most of their operations.").)  Although Brooke no

1   longer served as franchisor, Advantage Pacific and API remained in the insurance

2   business. (Coley Dep. at 15:18-16:17; 17:19-18:11, Exs. 3-5, 7-9.)

3         In 2008, Alicia Pool formed Connect while her husband, Jeremy Pool, the Chief

4   Executive Officer ("CEO") and a partial owner of Connect, was a Brooke franchisee.

5   (DZ Mot. Ex. D ("Pool Dep.") at 6:19-24; 8:1-7; 11:11-18; 12:13-13:7.) Mr. Pool was on

6   Brooke's franchise council, representing Brooke agents throughout the country as the

7   "voice for the agents on the franchise side." (*Id.* at 17:14-24; J. Pool Decl. (Dkt. ## 93

8   (unsigned with exhibits), 107 (signed without exhibits)) ¶ 6.)[7] Beginning in 2008, Mr.

9   Pool had contact with Mr. Coley over many months regarding their shared experiences

10  and concerns over Brooke's failure, Mr. Coley's work with DZ Bank regarding the

11  Notes, and whether Mr. Coley should fight DZ Bank. (Pool Dep. at 16:12-17:2;

12  18:7-19:20.) Mr. Pool knew that Advantage Pacific was a former Brooke franchisee.

13  (Am. Ans. at 2 (¶ 1).) Additionally, pursuant to his role on Brooke's franchise council,

14  Mr. Pool spoke directly with representatives from DZ Bank during Brooke's bankruptcy,

15  and he testified that DZ Bank was the primary bank for the Brooke transaction. (Pool

16  Dep. at 88:1-88:19; 134:1-17.)

17

18        [7] DZ Bank objects to the admission of the declarations of Jeremy Pool (J. Pool Decl.) and
    the declaration of Alica Pool (A. Pool Decl. (Dkt. ## 32 (unsigned with exhibits), # 108 (signed
    without exhibits))) because neither declaration was signed by the declaraant when originally
19  filed. (DZ Reply (Dkt. ## 101 (redacted), 102 (sealed)) at 2-3.) Subsequent to DZ Bank's
    objection, Connect filed signed copies of the two declarations. Accordingly, the court overrules
20  DZ Bank's objection to the declarations based on their lack of signature. DZ Bank also objects
    to certain parts of both declarations on other substantive grounds. The court addresses portions
21  of these declarations in subsequent sections of this order, but need not strictly resolve the
    evidentiary issues at this time because the court did not rely on this testimony in denying
22  portions of DZ Bank's motion, and admission of the testimony would not alter the court's ruling
    denying Connect's motion for summary judgment.

ORDER- 11

1     Connect subsequently purchased Advantage Pacific's book of business, including

2 all of its client accounts. (*See* Probst Aff. Ex. 19.) The sale is reflected in a letter, dated

3 April 1, 2010, from Mr. Coley to Connect. (*See id.*) The letter states that Advantage

4 Pacific is selling all of its assets to Connect, including but not limited to its "[c]lient list at

5 the date of sale" and its "goodwill . . . and all other business intangibles." (*Id.*) Indeed,

6 Connect has admitted in its Amended Answer that it purchased Advantage Pacific. (Am.

7 Ans. ¶¶ 32 ("Defendant admits that Advantage and Connect entered into a Buy Sell

8 Agreement – Bill of Sale . . ."), 47 ("In answer to paragraph 93 of the Complaint,

9 Connect admits that Connect purchased certain Advantage Pacific assets . . ."), 97

10 ("Advantage Pacific ultimately failed and was forced to sell its remaining accounts to . . .

11 Connect.").)

12     To effectuate the transfer of Advantage Pacific's book of business to Connect,

13 Connect and Advantage Pacific wrote a series of letters to insurance carriers directing the

14 carriers to transfer Advantage Pacific's producer codes to Connect's ownership and

15 directing the carriers to pay all commissions to Connect. (*See* Pool Dep. at 47:3-56:17,

16 75:6-80:2, 136:10-25; *id.* Exs. 4-5 (Dkt. ## 64-18, 64-19); *see also* DZ Mot. Ex. E.) As a

17 result, the carriers began to pay all commissions to Connect directly. (*See id*; *see* Pool

18 Dep. at 36:23-24 ("Correct. The carriers pay us [Connect], and then we [Connect] pay

19 the agents their percentages."); *see also* Probst Aff. Ex. 19 ("April 2010 Sales Letter")

20 ("Commissions earned on premiums received . . . prior to 4-1-2010 will be paid to

21 Advantage Pacific . . . . Commissions earned on premiums received . . . after 8-1-2010

22 will be paid to Connect . . . .").)

1       On January 1, 2011, Connect and Advantage Pacific also entered into a Producer

2 Agreement. (*See* Pool Dep. at 27:14-29:12, Ex. 2 (Dkt. # 68-1) ("Producer Agreement");

3 DZ Mot. Ex. B.10. (Dkt. ## 64-9 (redacted) 67-1 (sealed)) ("Producer Agreement");

4 Fuller Decl. Ex. M (Dkt. # 78) ("Producer Agreement").)  Mr. Pool testified that this

5 agreement allowed Connect to transfer Advantage Pacific's book of business to Connect.

6 (Pool Dep. at 28:21-24 ("This is what allows us to transfer the book of business and all

7 the other stuff. . . . [T]his is what gives us the contractual obligations of each party . . .

8 .").)  The Producer Agreement states:  "Connect and Producer [Advantage Pacific] agree

9 that Connect shall maintain a 100% undivided ownership interest in Producer's book of

10 business." (Producer Agreement ¶¶ A(10), C(3).)  Mr. Pool testified that the Producer

11 Agreement has never been terminated or assigned and remains in effect.  (Pool Dep.

12 36:17-19, 43:23-44:4.)  The Producer Agreement also states that the Producer, which is

13 Advantage Pacific, "shall receive the remaining ninety percent (90%) of the monthly

14 commissions following the deduction of Connect's ten percent (10%) override that

15 Connect receives under its contracts."[8]  (Producer Agreement ¶ C(3).)  Indeed, under the

16 _____

17     [8] Connect asserts that Advantage Pacific subsequently assigned its rights in the Producer
Agreement to an entity known as A Plus Insurance, Inc., and that Connect ratified the

18 assignment. (Con. Resp. at 5 (¶ 3.3).)  Connect bases this argument upon the declaration of
Alicia Pool and an email string, dated in August 2012.  (A. Pool Decl. ¶ 8, Ex. 1.)  In her

19 declaration, Ms. Pool states that, in the email string, Mr. Coley "specifically request[s] that he
assign Advantage's right, title, and interest in the Producer Agreement to A Plus Insurance, Inc.

20 ('A Plus')." (*Id.* ¶ 8.)  DZ Bank has objected to this portion of Ms. Pool's declaration arguing
that it contains "argument and opinion" rather than facts because the term "assign" does not

21 appear in the emails at all.  (DZ Reply at 2.)  The court has examined the email string and there
is no specific reference to an assignment of "Advantage's right, title, and interest in the Producer

22 Agreement to A Plus" to be found in it. (*See* A. Pool Decl. Ex. 1.)  Even if, however, Mr. Coley
or Advantage Pacific had assigned Advantage Pacific's rights in the Producer Agreement to A

1   agreement, Connect receives all of the commissions derived from Advantage Pacific's

2   book of business "at its home office." (*Id.* ¶ A(3).)  Only after it has received all of the

3   commissions does Connect "distribute Producer's [Advantage Pacific's] share of all

4   commissions and/or bonuses in accordance with the terms stated in the Producer

5   Agreement." (*Id.*)

6          Connect did not conduct any due diligence prior to entering into its transactions

7   with Advantage Pacific. (Pool Dep. at 30:21-31:5.)  DZ Bank did not consent to the

8   transfer of the Advantage Collateral or the API Collateral to Connect. (Probst Aff. ¶ 40.)

9   Connect did not pay DZ Bank for the Advantage Collateral or the API Collateral. (*Id.*

10  ¶ 41; *see also* Am. Ans. ¶ 39 ("[Connect] admits it did not make payments to DZ

11  Bank . . . .").)  Connect collected hundreds of thousands of dollars in commissions related

12  to its acquisition of Advantage Pacific. (*See* Pool Dep. 56:21-58:4; 60:18-61:12;

13  65:16-66:16; 74:7-15; 136:10-25.)

14      **F. The API Collateral and Connect's Transaction with Advantage Pacific**

15          DZ Bank asserts that the API Collateral was transferred to Connect as part of

16  Connect's transaction with Advantage Pacific.  In support of its position, DZ Bank notes

17  that Mr. Coley testified that he managed API and Advantage Pacific as one company

18

19  Plus, this fact is immaterial to the court's decision here because the alleged assignment occurred
    after Connect had already acquired Advantage Pacific's Assets (*see* Probst Aff. Ex. 19) and "a
    100% undivided ownership interest in [Advantage Pacific's] book of business," pursuant to the

20  Producer Agreement (*see* Producer Agreement ¶¶ A(10), C(3)).  All of the commissions from
    Advantage Pacific's book of business would still run through Connect prior to distribution by

21  Connect to itself and either Advantage Pacific or A Plus. (*See id.* ¶ A(3) ("Connect shall receive
    all commissions and/or bonuses derived through said contracts at its home office.  Thereafter,

22  Connect shall distribute Producer's [Advantage Pacific's] share of all commissions and/or
    bonuses in accordance with the terms stated in this Producer Agreement.").)

1  with a single bank account in the name of Advantage Pacific.  (Coley Dep. at

2  14:11-15:17.)  However, he apparently continued to file separate tax returns for the two

3  companies.  (Fullmer Decl.[9] Ex. Q.)  DZ Bank also points to the overlap between the

4  client list maintained in Brooke's computerized insurance management system for API,

5  which was designated as Brooke Franchise No. 948 (Probst Aff. ¶ 43, Exs. 21

6  (identifying API as No. 948), 22 ("API Client List")),[10] and Connect's annual

7  commission reports for the Advantage Pacific book of business from January 2011

8  through July 2015 (DZ Mot. Ex. G ("Connect Client List"); *see also* 11/19/15 Pool Decl.

9  (Dkt. # 55) ¶ 7 ("I have examined the annual Commissions Reports produced to DZ Bank

10  in discovery, which contain client lists.")).  (*See* DZ Mot. at 11-12.)  DZ Bank points out

11  that Connect's annual commission reports include hundreds of customers whose names

12  are also listed as clients for API in Brooke's computerized insurance management

13  system.  (*Id.* at 12 (citing Goa Aff. (Dkt. # 64-23); Annex A (Dkt. ## 69-70) (containing

14  Ms. Goa's marked comparison of the API Client List to the Connect Client List).)

15  //

16  //

17  

18  [9] DZ Bank objects to exhibits C, J, K, O, R, S, and paragraph 13 of Ms. Fullmer's
declaration.  (DZ Resp. at 1-5.)  The court need not resolve these evidentiary issues at this

19  juncture because, even if admitted, the court would have still denied Ms. Fullmer's motion for
summary judgment, and the exhibits had no bearing on the court's rulings with respect to DZ
Bank's motion.

20  
[10] Connect objects that Exhibit 21 and Exhibit 22 of Mr. Probst's affidavit are

21  inadmissible as hearsay.  (Con. Resp. at 1-3.)  The court agrees that at this point DZ Bank has
failed to lay a proper foundation for these records to be accepted into evidence on the basis of the
business records exception to the hearsay rule.  *See* Fed. R. Evid. 803(6).  The court addresses

22  this issue in detail in the section of this order related to API's assets.  *See infra* § III.C.6.

**G. Advantage Pacific and API Default under the Notes and DZ Bank Obtains a Default Judgment**

Advantage Pacific and API made their last payments on the Notes in March 2011 and April 2011, respectively. (Probst Aff. ¶ 36.) Under the Notes, non-payment is an event of default. (*Id.* ¶ 37, Exs. 4, 12.) Accordingly, both Advantage Pacific and API defaulted on their respective Notes, and Mr. Coley defaulted under his respective guaranties as well. (*Id.* ¶ 36.)

DZ Bank filed a complaint against Advantage Pacific, API, and Mr. Coley in the United States District Court for the Western District of Washington for their breach of the Notes and guarantees ("Advantage/API Case"). *See DZ Bank v. Advantage Pacific Insurance, Inc., et al.*, No. C11-5879BHS (W.D. Wash.), Dkt. # 1. On May 24, 2012, the court in the Advantage/API Case granted a default judgment in favor of DZ Bank and against Advantage Pacific in the amount of $214,678.38 and against API in the amount of $327,689.21 ("Advantage Judgment"). *See id.*, Dkt. # 24.

On September 4, 2012, Advantage Pacific and API administratively dissolved. (DZ Mot. Ex. C (Dkt. # 64-15).) DZ Bank asserts that it learned about the transfer of the Advantage Collateral to Connect on February 28, 2013, during DZ Bank's post-judgment proceedings against Advantage Pacific. (Probst Aff. ¶ 39.) Specifically, during the course of a deposition on September 4, 2012, Mr. Coley produced a document dated

1    April 1, 2010, reflecting the sale of Advantage Pacific's assets to Connect ("April 2010

2    Sale Letter").[11]  (*Id.* Ex. 19.)

3         On May 31, 2013, DZ Bank sent a letter to Connect demanding that Connect pay

4    DZ Bank for the collateral that was transferred pursuant to the April 2010 Sale Letter.

5    (*Id.* ¶ 42, Ex. 20.)  Neither Connect nor Advantage Pacific nor any other third-party has

6    paid DZ Bank for the Collateral or pursuant to the Advantage Judgment.  (*Id.* ¶ 41.)  On

7    November 5, 2014, DZ Bank sued Connect for conversion of the Advantage Collateral

8    and API Collateral and for unjust enrichment.[12]  (*See generally* Compl.)

9         On December 8, 2015, DZ Bank filed a motion for summary judgment on both of

10   its claims.  (*See generally* DZ Mot.)  On December 9, 2015, Connect filed a cross-motion

11   for summary judgment on DZ Bank's tort claims and raised numerous affirmative

12   defenses, both in its response to DZ Bank's motion for summary judgment and in its own

13

14

---

15        [11] Instead of February 28, 2013, Connect asserts that DZ Bank learned of Connect's

16   involvement no later than April 12, 2012, when Mr. Coley filed for bankruptcy and allegedly
     disclosed facts concerning Connect's involvement on his bankruptcy schedules. (Con. Resp. at
     5; 1/5/16 Fullmer Decl. (Dkt. # 96) ¶ 5, Ex. Z.)  Even if true, this discrepancy regarding dates is

17   immaterial.  Both dates are after Connect's 2010/2011 acquisition of the Collateral and fall
     within the three-year statute of limitations for conversion from the date DZ Bank filed suit on

18   November 5, 2014.  (*See* Compl.); *see also* RCW 4.16.080(2); *Crisman v. Crisman*, 931 P.2d
     163, 167 (Wash. Ct. App. 1997) (applying discovery rule to three-year statute of limitations for

19   conversion).  In addition, the court addresses Connect's affirmative defense of laches later in this
     order and does not find that Connect has asserted a valid affirmative defense on this basis. *See*

20   *infra* § III.E.4.

21        [12] This background section does not provide an exhaustive account of the evidence the
     parties have submitted.  The court addresses additional facts discussed or asserted by the parties

22   and whether those facts are material to the court's disposition in the sections of the court's
     analysis to which those additional facts pertain.

1  motion.[13]  (*See generally* Con. Mot.; Con. Resp.)  The court now addresses those

2  motions.

3                              **III.    ANALYSIS**

4        DZ Bank has moved for summary judgment on its claims for conversion and

5  unjust enrichment against Connect and for an award of damages.  (DZ Mot. at 15-24.)

6  DZ Bank also argues that Connect's affirmative defenses lack merit.  (*Id.* at 24-29.)

7  Connect opposes DZ Bank's Motion.  (Con. Resp.)  Connect also moves for summary

8  judgment on DZ Bank's claims and on its affirmative defenses.  (Con. Mot. at 11-25.)

9  DZ Bank opposes Connect's motion.  (DZ Resp. (Dkt. ## 88 (redacted), 89 (sealed).)

10  The court now considers these motions.

11        **A. Choice of Law**

12        A federal district court exercising diversity jurisdiction applies the choice of law

13  rules of the state in which it sits.  *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496

14  (1941); *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 661 (9th Cir. 1999).  "When

15  parties dispute choice of law, there must be an actual conflict between the laws or

16  _____

17        [13] Under the court's scheduling order, the parties' motions for summary judgment were
    due no later than December 8, 2015.  (Sched. Ord. (Dkt. # 20) at 1; *see also* 12/7/15 Order (Dkt.
18  # 61) at 2.)  Because Connect filed its motion for summary judgment in an untimely manner and
    did not seek leave from the court to do so under Federal Rule of Civil Procedure 6(b), the court
19  issued an order to show cause why the court should not strike Connect's motion.  (OSC (Dkt. #
    81).)  Connect's counsel filed her response to the court's order on December 11, 2015.  (OSC
20  Resp. (Dkt. # 82).)  Connect's counsel explained that the delay was due to "unforeseen personal
    crises, combined with technical difficulties."  (*Id.* at 4-6.)  Because the court does not wish to
21  penalize Connect for its counsel's delay during the critical summary judgment phase of this
    litigation, and because the court finds Connect's failure to adhere to the dispositive motions
22  deadline by one day caused little prejudice to DZ Bank, the court accepts Connect's response to
    its order to show cause and considers Connect's motion for summary judgment.

1  interests of Washington and the laws or interests of another state before Washington

2  courts will engage in a conflict of laws analysis." *Erwin v. Cotter Health Ctrs.*, 167 P.3d

3  1112, 1120 (Wash. 2007) (quoting *Seizer v. Sessions*, 940 P.2d 261, 264 (Wash. 1997)).

4  DZ Bank urges the court to apply Washington law, where Connect is registered to do

5  business and where both DZ Bank and Connect contracted with Advantage Pacfic. (DZ

6  Mot. at 14-15; Con. Mot. at 11.)  Connect acknowledges that, absent a conflict,

7  Washington law applies. (Con. Mot. at 11.)  Neither party asserts any relevant conflict

8  between Washington law and the law of Texas, where Connect is incorporated and

9  maintains a principal place of business (*id.* at 10), New York, where DZ Bank maintains

10  a place of business (DZ Mot. at 2 (citing Probst Aff. ¶ 4)), or Florida, where Connect also

11  maintains a principal place of business (Con. Mot. at 10), or Washington (where Connect

12  is registered to do business and where both DZ Bank and Connect contracted with

13  Advantage Pacific).[14]  (*See* DZ Mot. at 14-15; Con. Mot. at 11.)  Accordingly, the court

14  applies Washington law to DZ Bank's claims and Connect's affirmative defenses.[15]

15

16  [14] DZ Bank acknowledges that the elements of unjust enrichment are uniform in Texas,
    New York, Florida, and Washington. (DZ Mot. at 15 n.9.)  The only distinction between

17  Washington law and the law of New York, Texas, and Florida with respect to DZ Bank's
    conversion claim is that Washington does not allow punitive damages whereas the other three

18  states do.  However, DZ Bank does not seek punitive damages in this proceeding and asks the
    court to apply Washington law.  Accordingly, the court does not find this distinction to be

19  material to its choice of law analysis.

20  [15] Citing RCW 62A.9A-301, Connect argues that when considering disputes involving
    the UCC, the court should apply Texas law to issues involving Connect and Washington law to

21  issues involving Advantage Pacific or API. (Con. Mot. at 11.)  This provision states in relevant
    part that "while a debtor is located in a jurisdiction, the local law of that jurisdiction governs

22  perfection." RCW 62A.9A-301(1).  Connect is not "a debtor" in the sense that word is used in
    RCW 62A.9A-301(1).  Indeed, Connect is not a party to any of the notes or security agreements

1    **B. Standards**

2        Summary judgment is appropriate if the evidence, when viewed in the light most

3    favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

4    any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

5    P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*,

6    477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing

7    there is no genuine issue of material fact and that he or she is entitled to prevail as a

8    matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden,

9    then the non-moving party "must make a showing sufficient to establish a genuine

10   dispute of material fact regarding the existence of the essential elements of his case that

11   he must prove at trial" in order to withstand summary judgment. *Galen*, 477 F.3d at 658.

12   The court is "required to view the facts and draw reasonable inferences in the light most

13   favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

14       "[W]hen simultaneous cross-motions for summary judgment on the same claim

15   are before the court, the court must consider the appropriate evidentiary material

16   identified and submitted in support of both motions, and in opposition to both motions,

17   before ruling on each of them." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151,

18

---

19   cited herein. Rather, Connect is alleged to have converted DZ Bank's collateral. To the extent
     that any provision of the UCC applies to determine choice of law in this proceeding, it is RCW

20   62A.1-301(b), which provides in pertinent part: "In the absence of an agreement [between the
     parties to a transaction], this title applies to transactions bearing an appropriate relation to this

21   state." RCW 62A.1-301(b). Because Connect does not assert that there are any conflicts
     between the UCC laws of Texas and Washington, the court will apply Washington law to the

22   extent that the application of any provision of the UCC is necessary to resolve the issues
     presented.

1 | 1156 (9th Cir. 2015) (quoting *Fair Hous. Council of Riverside Cty., Inc. v. Riverside*

2 | *Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).  The court "rule[s] on each party's motion on

3 | an individual and separate basis, determining, for each side, whether a judgment may be

4 | entered in accordance with the Rule 56 standard." *Id.* (quoting 10A Charles Alan Wright,

5 | Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (3d ed.

6 | 1998)); *see also ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006)

7 | ("We evaluate each motion separately, giving the nonmoving party in each instance the

8 | benefit of all reasonable inferences." (citations and internal quotation marks omitted)).

9 | ### C. DZ Bank's Claim for Conversion

10 | Conversion is the unjustified interference with a chattel which deprives a person

11 | entitled to the property of possession. *Potter v. Wash. State Patrol*, 196 P.3d 691, 696-97

12 | (Wash. 2008).  DZ Bank argues that Connect converted DZ Bank's collateral by taking

13 | the Advantage Collateral and API Collateral pledged to DZ Bank without DZ Bank's

14 | consent and without compensating DZ Bank.  When a debtor transfers collateral subject

15 | to a perfected security interest, the secured party may commence an action against the

16 | purchaser for conversion. *In re Courson*, 409 B.R. 516, 530 (Bankr. E.D. Wash. 2009)

17 | (citing *Wash. State Bank v. Medalia Healthcare, LLC*, 984 P.2d 1041, 1043-45 (Wash.

18 | Ct. App. 1999)).  To prevail on its claim for conversion, DZ Bank must prove three

19 | elements:  (1) that Connect intentionally interfered with DZ Bank's property, (2) by

20 | taking the property or retaining it unlawfully, and (3) that Connect thereby deprived DZ

21 | Bank, the rightful owner, of possession. *See Aldaheff v. Meridian on Bainbridge Island,*

22 | *LLC*, 220 P.3d 1214, 1223 (Wash. 2009).

1    Setting aside the API Collateral for the moment, DZ Bank presents substantial

2    evidence that Connect converted the Advantage Collateral.  The sale of Advantage

3    Pacific is reflected in an April 1, 2010, letter from Mr. Coley to Connect (Probst Aff. Ex.

4    19), numerous letters from Connect and Advantage Pacific to various insurance carriers

5    directing the carriers to transfer Advantage Pacific's producer codes to Connect's

6    ownership and pay all commissions to Connect (*see* Pool Dep. at 47:3-56:17, 75:6-80:21,

7    136:10-25, Exs. 4-5; *see also* DZ Mot. Ex. E), and the Producer Agreement between

8    Connect and Advantage Pacific which twice recites that "Connect shall maintain a 100%

9    undivided ownership interest in [Advantage Pacific's] book of business" (Producer

10   Agreement ¶¶ A(10), C(3)).  In addition to this evidence, DZ Bank points to Connect's

11   admissions in its Amended Answer that it purchased Advantage Pacific's assets.  (Am.

12   Ans. ¶¶ 32, 47, 97.)  Connect also admits that it never paid DZ Bank.  (Am. Ans. ¶ 39

13   ("Defendant admits that it not make payments to DZ Bank.").)  These undisputed facts

14   establish the necessary elements that Connect converted DZ Bank's Advantage

15   Collateral.[16]  Nevertheless, Connect raises numerous arguments as to why, despite the

16

17   _____

18   [16] The collateral at issue, although it consists of intangible property in the form of client lists, is chattel that is subject to conversion under Washington law.  *See, e.g.*, *In re Marriage of Lanham & Kolde*, 106 P.3d 212, 218 (Wash. 2005) (ruling that intangible stock options are
19   chattel subject to conversion); RCW 62A.9A-102(42) (client lists are general intangibles).  Further, DZ Bank's security interest in the collateral is a sufficient interest in the property to
20   maintain a conversion action.  *See In re Marriage*, 106 P.3d at 219 ("We hold that some property interest in the allegedly converted goods is all that is needed to support an action in
21   conversion."); *Meyers Way Dev. Ltd. P'ship v. Univ. Sav. Bank*, 910 P.2d 1308, 1320 (Wash. Ct. App. 1996) (holding that a bank's security interest was a sufficient interest in the property to
22   maintain an action for conversion).

1  foregoing undisputed facts, the court should not enter summary judgment in DZ Bank's

2  favor on its claim for conversion.  The court addresses those arguments below.

3  **1. The Producer Agreement**

4      Despite the forgoing facts, Connect argues that that it did not exercise sufficient

5  dominion or control over DZ Bank's property to be liable for conversion.  Connect bases

6  this argument on its commitment in the Producer Agreement to remit 90% of the

7  commissions that it derives from Advantage's book of business back to Advantage

8  Pacific.  (*See* Con. Mot. at 12-16. (§§ 5.1.1-5.1.3); Con. Resp. at 10-13; *see also* Producer

9  Agreement ¶ C(3) ("Producer shall receive the remaining ninety percent (90%) of the

10  monthly commissions following the deduction of Connect's ten percent (10%) override

11  that Connect receives under its contracts.").)  The court, however, is not persuaded that

12  Connect's execution of and participation in the Producer Agreement with Advantage

13  Pacific provides any basis for denying summary judgment to DZ Bank on its claims.[17]

14      First, Connect ignores the fact that it agreed to purchase all of Advantage Pacific's

15  assets prior to entering into the Producer Agreement.  (*See* Probst Aff. Ex. 19.)  Indeed,

16  the Producer Agreement recites that Connect "shall maintain a 100% undivided

17  _____

18     [17] "When the contract provisions at issue are unambiguous, the court's interpretation of the contract is a question of law which may be decided on summary judgment." *Truck Ctr.*

19  *Corp. v. Gen. Motors Corp.*, 837 P.2d 631, 634 (Wash. Ct. App. 1992).  Here, both parties have placed the Producer Agreement before the court and asked the court to construe it on summary

20  judgment.  (*See* Con. Mot. at 12-13; Con. Resp. at 11-12; DZ Mot. at 18-19; DZ Resp. at 6-9, 13; DZ Reply at 7.)  Although Connect and DZ Bank argue for different interpretations of the

21  Producer Agreement, neither has asserted that the contract is ambiguous.  (*See id.*)  The court agrees that the terms of the Producer Agreement are unambiguous and that the court may

22  construe those terms as a matter of law with respect to the parties' cross motions for summary judgment.

1  ownership interest in [Advantage Pacific's] book of business." (Producer Agreement

2  ¶¶ A(10), C(3).)  Thus, the Producer Agreement reaffirms Connect's complete ownership

3  of Advantage Pacific's book of business.

4      Second, under the terms of the Producer Agreement, it is Connect, not Advantage

5  Pacific, that receives all of the commissions from the insurance companies and direct

6  their disposition—remitting 90% to Advantage Pacific "following the deduction of

7  Connect's ten percent." (*Id.* ¶ C(3).)  Thus, the Producer Agreement demonstrates

8  Connect's control over the assets because it allows Connect to direct the income stream

9  produced by the assets in question.  The court agrees with DZ Bank that the only

10  reasonable interpretation of the Producer Agreement is that Connect owns the assets or

11  book of business and has contractually agreed to split the revenue stream generated by

12  those assets, with Advantage Pacific receiving 90% and Connect receiving 10%.  Rather

13  than undermining DZ Bank's claim for conversion, the Producer Agreement reinforces it

14  by demonstrating Connect's control over the Advantage Collateral.

15      **2. Admissions in Connect's Amended Answer**

16      Connect also asserts that it is not bound by the admissions it made in its amended

17  answer, which confirm that it purchased Advantage Pacific's assets. (Con. Resp. at 13-

18  18.) "A statement in a complaint, answer or pretrial order is a judicial admission." *Am.*

19  *Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988).  Nevertheless,

20  "[w]here . . . the party making an ostensible judicial admission explains the error in a

21  subsequent pleading or by amendment, the trial court must accord the explanation due

22  weight." *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859-60 (9th Cir. 1995).  Thus, the court

1  considers the weight due to Connect's explanation for retracting the admissions in its

2  amended answer.

3       Connect purports to withdraw the admissions in its Amended Answer on the basis

4  of its late discovery of the Producer Agreement and its argument that discovery of the

5  Producer Agreement altered its understanding of its own relationship with Advantage

6  Pacific. (*See* Con. Resp. at 14-15 (citing Con. Mot. to Extend Expert Discovery (Dkt.

7  # 33) at 2).)  First, as noted above, the Producer Agreement specifically recites, not once

8  but twice, that Connect "maintain[s] a 100% undivided ownership interest in [Advantage

9  Pacific's] book of business." (Producer Agreement ¶¶ A(10), C(3).)  Thus, the Producer

10  Agreement is consistent with the admissions in Connect's amended answer and

11  Connect's "discovery" of it cannot serve as a justification for Connect's withdrawal of

12  those admissions.  Second, Connect and Advantage Pacific entered into the Producer

13  Agreement on January 1, 2011, and Connect admits that the Producer Agreement has

14  never been terminated. (*See* Pool Dep. 36:17-19, 43:23-44:4.)  Thus, the Producer

15  Agreement was in effect on January 7, 2015, when Connect filed its amended answer and

16  admitted that it had purchased Advantage Pacific's assets. (*See* Am. Ans.)  The court is

17  at a loss to understand how an agreement that was in effect when Connect filed its

18  operative answer could subsequently alter Connect's understanding of its own

19  relationship with Advantage Pacific.

20       When a party fails to provide a credible explanation for the error, the court need

21  not permit the party to withdraw its admission. *Valdiviezo v. Phelps Dodge Hidalgo*

22  *Smelter, Inc.*, 995 F. Supp. 1060, 1065-66 (D. Ariz. 1997); *see also Bauer v. Tacey Goss,*

1 | *P.S.*, No. C 12-00876 JSW, 2012 WL 2838834, at * 3 (N.D. Cal. July 10, 2012)

2 | ("Because Plaintiffs have not offered a credible explanation for their contradiction, the

3 | Court need not accept their amended allegations as true.") (citing *O'Connor v. Boeing N.*

4 | *Am., Inc.*, 92 F. Supp. 2d 1026, 1040 (C.D. Cal. 2000)).  Based on the foregoing, the

5 | court concludes that Connect's explanation for its "error" in admitting that it purchased

6 | Advantage Pacific is not credible. *See Valdiviezo*, 995 F. Supp. at 1065-66 (determining

7 | that plaintiff's assertion of mistake in arguing that the employment handbook was an

8 | enforceable contract was not credible considering she had the handbook since her

9 | commencement of employment and did not change her belief for over a year "and only

10 | after Defendants moved to enforce the arbitration clause in that Handbook"); *Patriot Rail*

11 | *Corp. v. Sierra R.R. Co.*, No. 2:09-CV-0009-TLN-AC, 2015 WL 4662707, at *5 (E.D.

12 | Cal. Aug. 5, 2015) ("[The law] does not allow a party to contradict binding admissions to

13 | avoid an unwanted outcome.").  Accordingly, the court declines to allow Connect to

14 | withdraw the admissions in its amended answer.

15 | **3. Connect's Good Faith and the Soto Agreement**

16 | In its motion, Connect refers to another agreement between itself and DZ Bank,

17 | which the parties refer to as the "Soto Agreement." (Con. Mot. at 6-7, 16-17; Fullmer

18 | Decl. Ex. J; *see* Probst Dep. (Dkt. ## 75-1 (redacted), 79 (sealed)) at 287:24-296:19.)  In

19 | the Soto Agreement, DZ Bank and Connect agreed that with respect to a former Brooke

20 | franchisee, Janice Soto, Connect could remit payments to DZ Bank, and DZ Bank would

21 | credit them to Ms. Soto's debt to DZ Bank. (Fullmer Decl. Ex. J; Probst Dep. at 289:25-

22 | 290:14.)  Connect argues that it "believed in good faith that if DZ Bank has rights to the

1   collateral [at issue here], DZ Bank would act as it had in the Soto transaction." (Con.

2   Mot. at 17.)  In other words, Connect asserts that if DZ Bank had requested, Connect

3   would have agreed to add Advantage Pacific to the Soto Agreement and remit to DZ

4   Bank the commissions that Advantage Pacific was receiving based on the Producer

5   Agreement. (*See id.*)  Connect, therefore, argues that its possession of DZ Bank's

6   collateral was "in good faith." (*See id.*)

7            First, Connect's "good faith" in depriving DZ Bank of its collateral is irrelevant to

8   DZ Bank's claim for conversion.  Wrongful intent is not an element of conversion, and

9   good faith is not a defense. *Paris Am. Corp. v. McCausland*, 759 P.2d 1210, 1215

10  (Wash. App. 1988).  "Therefore, neither good nor bad faith, neither care nor negligence,

11  neither knowledge nor ignorance, are of the gist of the action [in conversion]." *In re*

12  *Marriage*, 106 P.3d at 216 (quoting *Judkins v. Sadler-MacNeil*, 376 P.2d 837, 838

13  (Wash. 1962)).  Second, although the agreement provides that additional "Agents can be

14  added . . . at any time by Connect with DZ Bank's prior consent and approval" (Fullmer

15  Decl. Ex. J), no other agents, including Advantage Pacific and API, were ever added to

16  the Soto Agreement. (Probst Dep. at 295:2-9; *see also* Fullmer Decl. Ex. J at 3 (Schedule

17  A (naming only "Janice Soto").)  DZ Bank negotiated an agreement with Connect

18  concerning a different Brooke agent, but that does not mean that DZ Bank was obligated

19  to so agree with respect to any other Brooke agent or with respect to any other DZ Bank

20  collateral that was in the hands of Connect.  The court concludes that neither Connect's

21  asserted "good faith" nor the Soto Agreement are relevant to DZ Bank's claim for

22

1    conversion or raise any material factual issues that would prevent summary judgment in

2    DZ Bank's favor.

3        **4. The June 2008 Amendment to the 2006 Amended Security Agreement**

4        Connect also asserts that it did not interfere with DZ Bank's collateral based on

5    Connect's interpretation of a purported amendment to the Amended Security Agreement.

6    Rather, Connect argues that it was simply providing the "market access services" through

7    the Producer Agreement that Advantage Pacific had a right to receive from DZ Bank.

8    (Con. Mot. at 17.)  In a convoluted argument, Connect asserts DZ Bank acquired these

9    obligations to Advantage Pacific from Brooke Agency Services Company, LLC

10   ("BASC") as a result of a June 2008 amendment to the Amended Security Agreement.

11   (*Id.* at 5-6, 17.)  Connect argues that when BCF defaulted on its obligations to DZ Bank

12   under the Amended Security Agreement and DZ Bank foreclosed on those obligations,

13   DZ Bank not only acquired an interest in the loans covered by the Amended Security

14   Agreement but also inherited BASC's obligations to the various franchisees, including

15   Advantage Pacific, under the Brooke franchise agreements.  (*Id.*)  Thus, by providing

16   "market access services" to Advantage Pacific through the Producer Agreement, Connect

17   asserts that it was not exercising dominion over or interfering with DZ Bank's assets but

18   simply providing services to Advantage Pacific that DZ Bank was obligated to provide

19   but was not providing.  (*Id.*)

20

21

22

1    In support of this argument, Connect submits a copy of a form that Aleritas

2  purportedly filed with the Securities and Exchange Commission ("SEC").[18] (*Id.* at 5

3  (citing Fullmer Decl. Ex. I).) Connect argues that the document represents a June 19,

4  2008, amendment to the Amended Security Agreement ("June 2008 Amendment"),

5  which DZ Bank did not disclose in this action. (*Id.*) Connect asserts that the June 2008

6  Amendment terminated the Amended Security Agreement. (*Id.*) Connect also asserts

7  that the June 2008 Amendment (1) granted DZ Bank a security interest in "all Brooke

8  Franchise Agreements" in which BASC had an interest, and (2) included those Brooke

9  Franchise Agreements as a part of DZ Bank's collateral. (*Id.*) Connect argues that when

10  DZ Bank entered into the Surrender of Collateral and the Omnibus Assignment, DZ Bank

11  acquired not just the Notes and Security Agreements included in the Surrender of

12  Collateral, but also "all, right, title and interest" in the Brooke Franchise Agreements.

13  (*Id.*) Connect apparently interprets this phrase to mean that the transfer to DZ Bank

14  under the June 2008 Amendment included not just BASC's interests or rights in the

15  Brooke Franchise Agreements, but all of BASC's obligations under the Brooke Franchise

16  Agreements too. (*See id.* at 5-6, 17.)

17    The court rejects Connect's argument and its interpretation of the June 2008

18  Amendment. Connect misconstrues the contracts at issue and cites no law to support its

19  novel position. (*See id.*) Further, the plain language of the June 2008 Amendment belies

20  _____

21  [18] DZ Bank objects to the authenticity of this document. (DZ Resp. at 5.) The court need
    not decide this issue because, even assuming it is authentic, the document does not create an
22  issue of fact or otherwise defeat DZ Bank's motion for summary judgment on its claim for
    conversion.

ORDER- 29

1  Connect's argument.  First, the June 2008 Amendment does not purport to terminate the

2  Amended Security Agreement.  Instead, it amends the definition of "Termination Date"

3  in Section 1.1 of the Amended Security Agreement to include June 19, 2008.  (*See*

4  Fullmer Decl. Ex. I § 1.9, at 8.)  Second, the document states that BCC grants DZ Bank

5  "a security interest" in the "Brooke Franchise Agreements" including "all right, title and

6  interest of [BCC] in, to and under all Brooke Franchise Agreements . . . including,

7  without limitation, all moneys due and to become due under or in connection with any

8  such Brooke Franchise Agreement (whether in respect of Sales Commissions, fees,

9  expenses, indemnities or otherwise)."  (*Id.* at 27, 42, 57.)  The document does not convey

10 to DZ bank the obligations of any Brooke entity under the Franchise Agreements.

11      In any event, the October 2008 Surrender of Collateral, which foreclosed DZ

12 Bank's interest in the Notes and Security Interests, references the Amended Security

13 Agreement "(as amended or otherwise modified prior to the date hereof)." (Probst Aff.

14 ¶ 32, Ex. 16.)  In addition, the Surrender of Collateral was made by BCC and BCF to DZ

15 Bank.  (*See id.*)  Neither the Surrender of Collateral nor the Omnibus Assignment

16 included any of the Brooke Franchise Companies.  (*See id.* ¶ 33, Ex. 17.)  The court

17 concludes that the 2008 June Amendment is unambiguous.  It does not transfer to DZ

18 Bank any Brooke entity's obligations to the Franchisees, and it does not create a genuine

19

20

21

22

1    issue of fact preventing summary judgment in favor of DZ Bank on its claim for

2    conversion.[19]

3    **5. The Validity of DZ Bank's Security Interest**

4    Connect asserts that DZ Bank cannot prove conversion because DZ Bank's

5    perfection in its security interest has lapsed. (Con. Mot. at 21-24.) Under Washington

6    law, an equitable lien in property is insufficient to support an action for conversion; the

7    creditor must have a perfected security interest to support a claim for conversion. *See In*

8    *re Courson*, 409 B.R. at 530. DZ Bank perfected its security interests in the Advantage

9    Collateral and the API Collateral by filing the Advantage Financing Statement, the

10   Amended Advantage Financing Statement, and the API Financing Statement with the

11   Washington Secretary of State. (*See* Probst Aff. ¶¶ 20, 30, 35, Exs. 7, 15, 18); *supra*

12   §§ II.D., II.E., II.F. Connect asserts that the location of the intangible Advantage

13   Collateral and API Collateral changed from Washington to Florida and/or Texas when it

14   acquired the Collateral because Connect's primary places of business are in those two

15   states. (*See* Con. Mot. at 21-24.) Connect further argues that the perfection of DZ

16   Bank's security interest in the Advantage Collateral and API Collateral was impaired

17   when DZ Bank failed to re-file its Financing Statements in either Florida or Texas after

18   Connect acquired the Advantage Collateral and the API Collateral. (Con. Mot. at 21-24.)

19   Connect bases this argument on provisions from the UCC as adopted in Washington, *see*

20

21   [19] *See Dice v. City of Montesano*, 128 P.3d 1253, 1257 (Wash. Ct. App. 2006)

22   ("Interpretation of an unambiguous contract is a question of law, thus summary judgment is appropriate.").

ORDER- 31

1    RCW 62A.9A-316,[20] and a decision out of the Louisiana Supreme Court, *First Nat. Bank*

2    *of Picayune v. Pearl River Fabricators, Inc.*, 2006-2195 (La. 11/16/07), 971 So. 2d 302,

---

4    [20] Relevant portions of RCW 62A.9A-316 provide as follows:

5    (a) **General rule: Effect on perfection of change in governing law.** A security
     interest perfected pursuant to the law of the jurisdiction designated in RCW
6    62A.9A-301(1) [where the security interest is perfected] or 62A.9A-305(c)
     [where the debtor is located] remains perfected until the earliest of:

7    (1) The time perfection would have ceased under the law of that jurisdiction;

8    (2) The expiration of four months after a change of the debtor's location to
9    another jurisdiction; or

10   (3) The expiration of one year after a transfer of collateral to a person that thereby
     becomes a debtor and is located in another jurisdiction.

11   (b) Security interest perfected or unperfected under law of new jurisdiction. If a
     security interest described in subsection (a) of this section becomes perfected
12   under the law of the other jurisdiction before the earliest time or event described
     in subsection (a) of this section, it remains perfected thereafter. If the security
13   interest does not become perfected under the law of the other jurisdiction before
     the earliest time or event, it becomes unperfected and is deemed never to have
14   been perfected as against a purchaser of the collateral for value.

15                              **********

16   (i) **Effect of change in governing law on financing statement filed against
     original debtor.** If a financing statement naming an original debtor is filed
17   pursuant to the law of the jurisdiction designated in RCW 62A.9A-301(1) [where
     the security interest is located] or 62A.9A-305(c) [where the debtor is located]
     and the new debtor is located in another jurisdiction, the following rules apply:

18
19   (1) The financing statement is effective to perfect a security interest in collateral
     acquired by the new debtor before, and within four months after, the new debtor
20   becomes bound under RCW 62A.9A-203(d), if the financing statement would
     have been effective to perfect a security interest in the collateral had the collateral
     been acquired by the original debtor.

21   (2) A security interest perfected by the financing statement and which becomes
22   perfected under the law of the other jurisdiction before the earlier of the time the
     financing statement would have become ineffective under the law of the

---

1   310-17.  (*See* Con. Mot. at 21-24.)  As discussed below, Connect's interpretation of these

2   statutory provisions and the decision out of Louisiana are incorrect.

3   According to Connect, under RCW 62A.9A-316, once the Advantage Collateral

4   and API Collateral were moved to Texas and/or Florida as a result of Connect's

5   acquisition, DZ Bank was required to re-file its various Financing Statements in Texas

6   and/or Florida, and when it failed to do so DZ Bank lost its security interests.  (*See* Con.

7   Mot. at 22 ("[A] secured creditor's failure to file a new financing statement in the new

8   jurisdiction results in the loss of the security interest.").)  The court found no Washington

9   law interpreting this provision of Washington's UCC, and the parties have cited none.

10  Thus, the court resorts to well-reasoned decisions from other jurisdictions interpreting

11  similar provisions of the UCC and commentators for guidance.

12  Connect's interpretation of this statute is problematic because it is contrary to the

13  statute's purpose and the case law of other states regarding the unique situation facing the

14  court.  Properly interpreted, the statute applies to a purchase or other transfer that occurs

15  in the destination state, after collateral has been moved there.  The statute does not apply

16  to purchasers, like Connect, who purchase in the original state.  According to a leading

17  UCC treatise, "[t]he purpose of the . . . re-filing requirement is to protect third persons in

18  ┌─────────────────────────────────────────────────────────────

19  │ jurisdiction designated in RCW 62A.9A-301(1) [where the security interest is
    │ located] or 62A.9A-305(c) [where the debtor is located] or the expiration of the
    │ four-month period remains perfected thereafter.  A security interest that is

20  │ perfected by the financing statement but which does not become perfected under
    │ the law of the other jurisdiction before the earlier time or event becomes

21  │ unperfected and is deemed never to have been perfected as against a purchaser of
    │ the collateral for value.

22  RCW 62A.9A-316.

ORDER- 33

1    the removal state" who purchase after removal.  8A *Lawrence's Anderson on the Uniform*

2    *Commercial Code* § 9-103:100 (3d. ed. 2006).  Thus, if a creditor does not timely re-file

3    in the destination state, "perfection is lost as to a person who becomes a 'purchaser' after

4    the goods were removed to the other state." *Id.*  On the other hand, "[w]hen collateral

5    subject to a perfected security interest is sold to a buyer within the state in which the

6    security interest is created and perfected, and thereafter the collateral is removed to

7    another state, the secured creditor is not required to re-perfect . . . in order to preserve the

8    perfection." *Id.*

9           The reason for the foregoing conclusion is straightforward.  Purchasers like

10   Connect, which acquire collateral in the original state, where the security interest is a

11   matter of public record, can discover the security interest by checking the public records

12   where the collateral is located.  Such persons or entities do not need the protection of

13   being re-notified in the destination state after the collateral has been removed.  On the

14   other hand, those who may acquire the collateral in the destination or removal state need

15   the protection of re-filing in that state.  They cannot be expected to know from what

16   jurisdiction the collateral came and have no practical way to apprise themselves of any

17   security interest that may exist elsewhere.

18          Case law from other jurisdictions supports this view.  In *Alpine Paper Co. v.*

19   *Lontz*, 856 S.W.2d 940, 941 (Mo. Ct. App. 1993), the Missouri Court of Appeals

20   considered whether a creditor who perfected its security interest in Iowa became

21   "unperfected" as against purchasers who purchased the collateral in Iowa but later moved

22   the collateral to Missouri.  Similar to Connect here, the purchasers in *Lontz* claimed that

1  they acquired superior rights to the collateral when the creditor failed to timely re-perfect

2  its security interest in Missouri after the purchasers moved the collateral there. *Id.* The

3  creditor argued that "because the [purchasers] purchased the collateral before it was

4  removed to Missouri[,] they took it subject to the security interest perfected in Iowa and

5  the security interest did not have to be re-perfected in Missouri to be effective against

6  these [purchasers]." *Id.*

7         The creditor in *Lontz* prevailed. *Id.* at 943. The *Lontz* court noted that

8  "[i]nterpretation of the U.C.C. must be made with an eye toward promoting the

9  underlying purposes and policies of the statute." *Id.* In light of those purposes and

10 policies, the court held that the third-parties could not benefit from the creditor's failure

11 to re-file in the destination or removal state:

12        The [re-filing rule] was designed to protect creditors from absconding
          debtors. It also protects third persons in the second state where it would be
13        impractical to charge them with notice of a filing in the first state. . . . It is
          not intended to protect a third party who was not an innocent party and was
14        involved before the removal. . . .

15        [The purchasers] admitted that they knew the [collateral] was located in
          Iowa at the time of purchase. They knew that the proper place to look for
16        any encumbrances on the property would be in Iowa. Therefore, we find no
          reason not to impute knowledge of [the creditor's] security interest in the
17        property to [the purchasers]. This is not a situation where the [re-filing]
          rule was meant to apply. There was no absconding debtor and the
18        purchaser was not innocent and unknowing. When the sale itself results in
          an interstate transfer of collateral, the secured party does not need to refile.
19        Otherwise, any out-of-state purchaser would be able to defeat a valid and
          perfected security interest.

20
    *Id.* (internal quotation marks and citations omitted).
21

22

ORDER- 35

1  The Third Circuit reached a similar result in *General Electric Credit Corp. v.*

2  *Nardulli & Sons, Inc.*, 836 F.2d 184 (3d Cir. 1988).  In *Nardulli*, a debtor moved

3  equipment in which a creditor had a perfected security interest from Pennsylvania to

4  Indiana.  *Id.* at 186, 189.  After moving the equipment, the debtor leased it to a

5  third-party.  *Id.* at 186.  The creditor failed to re-perfect its security interest in Indiana

6  after the debtor moved the equipment there.  *Id.*  Nevertheless, the Third Circuit held that,

7  as between the debtor and the creditor, the failure to re-file in Indiana did not impair the

8  creditor's security interests.  *Id.* at 190-91.  This was so because the re-filing requirement

9  was intended to protect persons in the destination or removal state who acquire rights in

10  the collateral after it has been removed:

11      The purpose of the . . . [re]filing requirement is to protect subsequent
        creditors and/or purchasers of the collateral who otherwise cannot
12      determine whether the collateral is subject to the interests of a third
        party. . . . .
13
        Because . . . [the debtor] . . . had knowledge of the liens held by [the
14      creditors] . . . , they may not avoid them simply because those creditors did
        not file financing statements.  The filing requirements were not enacted to
15      protect [the debtor]; they were enacted to protect future creditors or
        purchasers . . . .
16
                              **********
17
        Therefore, despite [the creditor's] failure to file in [Indiana] a copy of its
18      previously filed financing statements, it maintains a valid security interest
        in the [collateral] as between it and [the debtor].
19
    *Id.* at 191 (internal citations omitted).
20
21  The First Circuit concurs with the foregoing authorities.  *In re Halmar*

22  *Distributors, Inc.*, 968 F.2d 121 (1st Cir. 1992), involved a priority dispute between

1   senior and junior secured creditors arising after the collateral was moved from one state

2   to another. *See id.* at 122. Although the senior creditor failed to timely re-perfect its

3   security interest in the new jurisdiction, the court declined to give priority to the junior

4   creditor. *Id.* at 126. The dispositive fact was the junior creditor's knowledge of the

5   senior creditor's lien when it acquired its junior lien. *Id.* Because the junior creditor had

6   this knowledge, re-perfection as to the junior creditor was not necessary:

7           Additional notice to the [junior creditor] in the form of refiling . . . was as
        unnecessary and useless an act as can be imagined. Refiling is intended to
8           protect parties in entirely different circumstances. We see no need to apply
        the rule here when to do so would give an unjustified advantage to a party.
9           Such a construction of the Code would hardly be liberal, nor would it
        promote the Code's underlying purposes and policies.
10

11  *Id.* at 126 (footnote omitted). The common thread in the above cases is the re-filing rule

12  must not be applied blindly but rather with an eye toward the UCC's underlying purposes

13  and policies. *See* RCW 62A.1-103(a) ("This title must be liberally construed and applied

    to promote its underlying purposes and policies . . . .").
14
            Finally, *First National Bank of Picayune v. Pearl River Fabricators, Inc.*, the
15
    authority that Connect relies upon, is not to the contrary. In *Pearl River*, a Mississippi
16
    debtor gave a security interest in collateral located in Mississippi to a Mississippi bank,
17
    which the bank perfected by filing a financing statement in Mississippi. 971 So. 2d at
18
    304. The Mississippi debtor then sold the collateral to an Indiana purchaser, who never
19
    took possession of the collateral. *Id.* at 304-05. The Indiana purchaser then resold the
20
    collateral to a Louisiana purchaser. *Id.* at 305. Despite the fact that the collateral
21
    remained in Mississippi, the *Pearl River* court held that the Louisiana purchaser actually
22

1   purchased the collateral from Indiana because the title to the collateral was located there.

2   *Id.* at 311. The bank failed to timely refile its financing statement in Louisiana. *Id.*

3   Thus, in *Pearl River*, the court applied the provisions of the UCC to protect a subsequent

4   buyer (twice removed from the original debtor), who purchased the collateral from a state

5   in which there was no financing statement on file. This is not the position in which

6   Connect finds itself. Connect purchased the collateral at issue from Advantage Pacific,

7   the original debtor, in Washington, where DZ Bank had filed the requisite financing

8   statements. (*See* Probst Aff. ¶¶ 20, 30, 35, Exs. 7, 15, 18); *see supra* §§ II.D., II.E., II.F.

9   Thus, a narrow application of *Pearl River* does not support Connect's position.[21] Based

10   on the foregoing, the court concludes that Connect has not raised a genuine issue of

11   material fact concerning the perfection of DZ Bank's security interest in the Advantage

12   or API Collateral.[22]

13

---

14

15   [21] To the extent *Pearl River* could be interpreted to require DZ Bank to re-file its financing statements in Texas and/or Florida, the court would reject it as unpersuasive.

16   [22] Connect makes an additional, similar argument pursuant to RCW 62A.9A-508(b). This provision of Washington's UCC requires a secured party to re-file its financing statement in

17   some circumstances following a name change of the debtor that renders the filed financing statement "seriously misleading." RCW 62A.9A-508(b). Connect asserts without citation to the

18   record that "Advantage Pacific changed its name to A Plus on August 1, 2011," but that "DZ Bank failed to file a new financing statement." (Con. Mot. at 24-25.) Connect asserts earlier in

19   its motion, however, that Mr. "Coley registered A Plus Insurance as a *new* entity with the Washington Secretary of State," not that he changed the name of Advantage Plus to A Plus

20   Insurance. (*Id.* at 8 (italics added) (citing Fullmer Decl. Ex. O).) Exhibit O consists of photocopies of checks written by Connect in some instances to Advantage Pacific and in other

21   instances to A Plus Insurance. (Fullmer Decl. Ex. O.) This evidence alone does not establish either of Connect's assertions—that Advantage Pacific changed its name to A Plus or that Mr. Coley created an entirely new entity.

22   But interpreting the evidence in the light most favorable to Connect, and thus assuming that Advantage Pacific did change its name to A Plus Insurance on August 1, 2011, the court

### 6. API's Assets

DZ Bank argues that although the April 2010 Sales Letter and the Producer Agreement were between Connect and Advantage Pacific, the transfer of assets to Connect included the assets of both Advantage Pacific and API. (DZ Mot. at 11-12; DZ Reply at 10-12.) DZ Bank rests its argument on Mr. Coley's testimony that he merged API with Advantage Pacific (Coley Dep. at 14:11-15:17) and on DZ Bank's comparison of the API Client List (*see* Prost Decl. ¶ 43, Exs. 21, 22) and the Connect Client List (DZ Mot. Ex. G), which shows an overlap of hundreds of names. (*See generally* Goa Decl.)

Connect responds that there is a disputed issue of fact whether Mr. Coley's merger of the two companies because he kept separate books for the two companies and filed separate tax returns.[23] (Con. Resp. at 19.) In addition, Connect objects that the API Customer list is both "factually flawed" and that DZ Bank's evidence on this issue is inadmissible. (*Id.* at 19-20.)

---

cannot conclude that RCW 62A.9A-508(b) would alter the outcome on the parties' cross-motions for summary judgment in any way. The Producer Agreement, which was effective on January 1, 2011, recites that "Connect and [Advantage Pacific] agree that Connect shall maintain a 100% undivided ownership interest in [Advantage Pacific's] book of business." (*See* Producer Agreement at 1, §§ A(10), C(3).) Thus, any change in Advantage Pacific's name occurred after Connect had already acquired Advantage Pacific's book of business. Accordingly, the court concludes that RCW 62A9A-508(b) was not applicable to Connect's acquisition of the Advantage Collateral and/or the API Collateral from Advantage Pacific.

[23] DZ Bank argues that this issue is not material "because the evidence reflects . . . that hundreds of API customers appeared in both the API Client List from 2008 and the Connect Client List." (DZ Reply at 10.) If DZ Bank can lay a proper foundation for the API Client List at trial and then demonstrate this type of overlap, the court is inclined to agree. However, because the trial is to the court without a jury (*see* Stip. Order (Dkt. # 113) (withdrawing jury demand)), the court will permit Connect some leeway in presenting this evidence and demonstrating its materiality.

1    Specifically, Connect objects that Exhibit 21 (Dkt. # 65-21) and Exhibit 22 (Dkt. #

2   65-22) of Mr. Probst's affidavit (collectively, the "BMS Exhibits") are inadmissible as

3   hearsay. (Con. Resp. at 1-3.) DZ Bank retrieved these documents from Brooke

4   Management System ("BMS"). Exhibit 21 lists Brooke franchises, including Advantage

5   Pacific and API, by specific franchise numbers, and Exhibit 22 contains the API Client

6   List. (*See* Probst Aff. ¶ 43.) DZ Bank argues that the BMS Exhibits are admissible

7   under the business records exception to the hearsay rule. *See* Fed. R. Evid. 803(6). DZ

8   Bank bears the burden of establishing that the records fall within the business records

9   exception. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v.*

10   *Catabran*, 836 F.2d 453, 457 (9th Cir. 1988) ("The proponent of the business records

11   must satisfy the foundational requirements of the business records exception.").

12    Under the business records exception to the hearsay rule, the proponent of the

13   evidence must provide testimony from the custodian of the document or another

14   "qualified witness" that satisfies three requirements: (1) "the record was made at or near

15   the time by—or from information transmitted by—someone with knowledge"; (2) "the

16   record was kept in the course of a regularly conducted activity of a business "; and (3)

17   "making the record was a regular practice of that activity." Fed. R. Evid. 803(6)(A)-(D).

18   In this circuit, however, records that a business "receives from others are admissible

19   under Federal Rule of Evidence 803(6)" when three conditions are met: (1) the records

20   are received directly from the other party and are kept by the recipient in the regular

21   course of its business, (2) the records are relied upon by the recipient business, and (3)

22   the recipient business has a substantial interest in the accuracy of the records. *See, e.g.,*

1    *MRT Constr., Inc. v. Hardrives, Inc.*, 158 F.3d 478, 483 (9th Cir. 1998) (citing *United*

2    *States v. Childs*, 5 F.3d 1328, 1333-34 n.3 (9th Cir. 1993)); *see also Davis v. CACH,*

3    *LLC*, No. 14-CV-03892-BLF, 2015 WL 913392, at *5 (N.D. Cal. Mar. 2, 2015) (applying

4    *Hardrives* in the context of the defendant's attempt to collect on a debt).   DZ Bank argues

5    that Exhibits 21 and 22 are admissible based on *Hardrives*, and this may ultimately be

6    correct.   However, Mr. Probst has not laid a sufficient foundation to qualify the two

7    exhibits.   Mr. Probst testifies that "DZ Bank has possession of the client list maintained

8    in Brooke's computerized insurance management system for API" and that "DZ Bank

9    retrieved from Brooke's computerized insurance management system the respective list

10   of clients for each of the Brooke franchisees whose property was secured by DZ Bank."

11   (Probst Aff. ¶ 43.)  This testimony does not satisfy the three elements set for the in

12   *Hardrives*, which are required for the documents to qualify under the business records

13   exception to the hearsay rule.

14          In addition, the records are only admissible if the party opposing admission "does

15   not show that the source of information or the method or circumstances of preparation

16   indicate a lack of trustworthiness."  Fed. R. Evid. 803(6)(E).   Based on an email chain

17   that is itself hearsay, Connect argues that the information contained in the client list is not

18   trustworthy.  (Con. Resp. at 2-3.)  In the email chain, an employee of DZ Bank notes, in

19   relation to a client list for an entirely different franchise, that "DZ Bank cannot confirm

20   the accuracy of all of the policies" because "the data is from [BMS] . . . (around

21   September 2008)." (1/5/16 Fullmer Decl. (Dkt. ## 96-98) Ex. BB.)  This evidence is

22

1  alone is likely insufficient to demonstrate the untrustworthiness of the BMS Exhibits at

2  issue here.

3  Nevertheless, the court concludes that DZ Bank has failed to lay a sufficient

4  foundation to qualify the BMS Exhibits under the business records exception to the

5  hearsay rule. Although the court will not consider these records on summary judgment,

6  DZ Bank will have an opportunity to lay a proper foundation under the business records

7  exception to the hearsay rule at trial. In addition, Connect may present evidence that the

8  records "indicate a lack of trustworthiness." *See* Fed. R. Evid. 803(6)(E). The court

9  reserves its ultimate ruling on the admissibility of these records for trial. However,

10  because the court cannot consider this evidence in support of DZ Bank's motion, a

11  question of material fact remains concerning whether and to what extent Advantage

12  Pacific or Mr. Coley transferred the API Collateral to Connect. The court, therefore,

13  denies this portion of DZ Bank's motion for summary judgment and reserves this issue

14  for trial.

15  **7. DZ Bank's Damages**

16  DZ Bank seeks monetary damages for conversion. (DZ Mot. at 19.) In an action

17  for conversion, the measure of damages depends upon whether the conversion was

18  unintentional or willful. *Glaspey v. Prelusky*, 219 P.2d 585, 587 (Wash. 1950) ("The

19  courts have recognized a difference between what may be termed an ordinary conversion

20  and a willful conversion with respect to the measure of damages.")

21  　　Absent willful misconduct, the measure of damages for conversion is the
　　fair market value of the property at the time and place of conversion. . . .

22  　　Fair market value is the value for which the property could have been sold

1   in the course of a voluntary sale between a willing buyer and a willing
2   seller, taking into account the use to which the property is adapted or could
    reasonably be adapted.

3   *Potter*, 196 P.3d at 697 (internal citation and quotation marks omitted).  Alternatively, if

4   the conversion was willful, "the measure of damages is the highest market value of the

5   property within a reasonable time after the conversion, or, as sometimes stated, the

6   highest price shown between the time of conversion and the institution of the suit."

7   *Glaspey*, 219 P.2d at 587.

8   Based on the report of its expert witnesses, DZ Bank asserts that the fair market

9   value of Advantage Pacific's book of business was between $275,000.00 and

10  $350,000.00 and the fair market value for API's book of business was between

11  $60,000.00 and $100,000.00.  (DZ Mot. Ex. F (attaching the expert witness report).)

12  Thus, DZ Bank asserts that it is entitled to damages in the amount of $335,000.00

13  ($275,000.00 + $60,000.00) for ordinary conversion and $450,000.00 ($350,000.00 +

14  $100,000.00) if the court finds that Connect's conversion was willful.[24]  (*Id.* at 20-21

15  (citing Ex. F).)  Connect did not designate a rebuttal expert witness, and accordingly, DZ

16  Bank asserts that these values are uncontested.  (*Id.* at 21.)  Despite its failure to

17  designate a rebuttal expert, Connect challenges DZ Bank's damages calculation on three

18  grounds:  (1) the 2010 tax returns which serve as the basis for the report are inadmissible

19

20  _____

    [24] Because the court has held that summary judgment is not appropriate with respect to

21  DZ Bank's claim for conversion of API's book of business, the court cannot enter summary
    judgment on DZ Bank's request for damages on that claim.  *See supra* § III.C.6.  The court can,

22  however, consider DZ Bank's motion for summary judgment with respect to DZ Bank's claim
    for conversion of Advantage Pacific's book of business.

1  because they are unsigned, (2) DZ Bank's experts did not consider the "distressed" nature

2  of the sale, (3) DZ Bank's experts amended their report regarding API.  (Con. Resp. at

3  21-23.)

4       First, the court concludes that the tax returns for Advantage Pacific and API are

5  admissible.[25]  DZ Bank laid a proper foundation for the admission of these tax returns

6  when it deposed Mr. Coley, who was the sole owner and officer of both Advantage

7  Pacific and API.  (Coley Dep. at 17:3-9.)  Mr. Coley produced the unsigned tax returns to

8  DZ Bank in response to subpoenas DZ Bank issued requesting copies of Advantage

9  Pacific's and API's tax returns during the Advantage/API Case.  (*See* Con. Mot. at 10

10  ¶ 2.47.)  During the course of Mr. Coley's deposition in this matter, DZ Bank presented

11  copies of these tax returns to Mr. Coley, and he acknowledged them.  (*See* Coley Dep. at

12  13:20-25 (identifying the 2010 Advantage Pacific tax return and acknowledging that "[i]t

13  appears to be" a copy of the return filed for Advantage Pacific in 2010); 17:21-18:4

14  (identifying the 2010 API tax return and acknowledging that "[i]t appears to be" a copy

15  of the return filed for API in 2010).)  Finally, at oral argument, Connect's counsel

16  conceded that Mr. Coley produced the tax returns at issue and acknowledged that they

17  were his in his deposition.  Based on these facts, the court concludes that the lack of

18  signature on the returns does not preclude their admission into evidence.  *See, e.g.,*

19  *United States v. Osarenkhoe*, 439 F. App'x 66, 69 (2d Cir. 2011) (relying on Fed. R.

20  _____

21  [25]Although all of the tax returns for Advantage Pacific and API from 2008, 2009, 2010,
and 2011 are unsigned, Connect only objects to the 2010 tax returns that underpin DZ Bank's
expert's report.  (*See* Con. Mot. at 4.)  Connect relies upon the other unsigned tax returns.  (*See*

22  Fullmer Decl. Ex. Q; Con. Mot. at 9, 16; Con. Resp. at 19-20.)

1   Evid. 901(b)(4) and affirming admission of an unsigned tax return "[b]ecause the tax

2   return appeared to be [the defendant's] personal federal tax return on its face and it was

3   located in her possessions among other financial documents, including her tax returns

4   from other years that she did not dispute were hers").  The court overrules Connect's

5   objection.

6        Connect also argues that summary judgment is inappropriate with respect to the

7   amount of DZ Bank's damages because DZ Bank's experts did not consider the

8   "distressed" nature of the sale of Advantage Pacific and API.  In support of its position,

9   Connect states without citation to the record[26] that Mr. Coley testified that he was losing

10  appointments for both Advantage Pacific and API and that this was "the very reason he

11  sought substitute market access services from Connect."  (Con Resp. at 23.)  Connect,

12  however, has not cited any specific evidence to support a reduced valuation of the

13  businesses or to establish the amount of any such reduction.  (*See id.*)  Connect cannot

14  defeat DZ Bank's motion for summary judgment with mere conjecture and without

15  evidence that raises a triable issue of fact.  *See Anderson*, 477 U.S. at 249-50.

16       Finally, Connect asserts that it should be allowed to cross-examine DZ Bank's

17  expert witnesses at trial because DZ Bank produced an amended expert damages report

18  on the last day of discovery with a different conclusion than the original.  (Con. Mot. at

19  22 (citing DZ Mot. Group Ex. F (Dkt. # 64-21) at 4, 23).)  Connect argues that the first

20  _____

21       [26] "It behooves litigants, particularly in a case with a record of this magnitude, to resist
     the temptation to treat judges as if they were pigs sniffing for truffles." *In re Oracle Corp. Sec.*

22   *Litig.*, 627 F.3d 376, 386 (9th Cir. 2010) (citing *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003,
     1007 n.1 (9th Cir. 2000); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

1    opinion concluded that API had no insurance assets, but only real property assets.  The

2    second opinion concluded that API had insurance assets and purportedly valued them.

3    The basis for both opinions was API's 2010 tax return.  Connect argues that the

4    contradictory conclusions of the two reports create an issue of fact.  The court agrees.

5    Ordinarily, "[n]either a desire to cross-examine [an] affiant nor an unspecified hope of

6    undermining his or her credibility suffices to avert summary judgment, unless other

7    evidence about an affiant's credibility raises a genuine issue of material fact." *Frederick*

8    *S. Wyle Prof'l Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir. 1985).  Here, Connect

9    has pointed to evidence about DZ Bank's experts' opinion—two contradictory expert

10   reports—sufficient to raise a genuine issue of material fact.  Further, the second amended

11   report was produced on the last day of the discovery period, and therefore, Connect did

12   not have an opportunity to ask DZ Bank's experts about the discrepancy through

13   deposition or other means of discovery.  Accordingly, the court concludes that Connect's

14   counsel should have an opportunity to cross examine DZ Bank's expert witness at trial.

15   The court denies the portion of DZ Bank's motion for summary judgment related to the

16   amount of its damages.

17       **D. Unjust Enrichment**

18           Based on the same facts that underlie its claim for conversion, DZ Bank also

19   brought a claim against Connect for unjust enrichment.  (*See* Compl. ¶¶ 113-16.)  "Unjust

20   enrichment is the method of recovery for the value of the benefit retained absent any

21   contractual relationship because notions of fairness and justice require it." *Young v.*

22   *Young*, 191 P.3d 1258, 1262 (Wash. 2008); *see Bailie Comm'ns, Ltd. v. Trend Bus. Sys.*,

1 | *Inc.*, 810 P.2d 12, 18 (Wash. Ct. App. 1991) ("Unjust enrichment occurs when one

2 | retains money or benefits which in justice and equity belong to another."). The elements

3 | of an unjust enrichment claim are: (1) the defendant receives a benefit, (2) the received

4 | benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the

5 | defendant to retain the benefit without payment. *Young*, 191 P.3d at 1262.

6 |       DZ Bank argues that, just as it is entitled to damages for Connect's conversion of

7 | its collateral, it is also entitled to the same damages under a theory of unjust enrichment.

8 | (DZ Mot. at 23-24.) DZ Bank argues that Connect received the benefit of Advantage

9 | Pacific's book of business at DZ Bank's expense because the transfer to Connect of

10 | Advantage Pacific's book of business, which also represented DZ Bank's collateral,

11 | contravened DZ Bank's lien rights. (DZ Mot. at 24.) DZ Bank concludes that the

12 | circumstances make it unjust for Connect to retain this benefit without paying DZ Bank

13 | because the accounts and rights to the payment of commissions on those accounts belong

14 | to DZ Bank pursuant to the Advantage Security Interest. (*See id.*)

15 |       Connect asserts that it was not unjustly enriched by "its dealings with Mr. Coley"

16 | because, under the Producer Agreement, Connect "does not have dominion over the

17 | collateral" and has a "duty to pay Advantage/A Plus . . . 90% of commissions." (Con.

18 | Mot. at 19.) Connect also argues that it was not unjustly enriched by its acquisition of the

19 | Advantage Collateral because upon termination of the Producer Agreement, Connect

20 | must pay $159,897.00 to Mr. Coley if Connect wants to keep Advantage Pacific's book

21 | of business. (*Id.* at 19-20.) The court addressed these arguments in its analysis of DZ

22 | Bank's claim for conversion. *See supra* § III.C.1. Contrary to Connect's argument, the

1  Producer Agreement demonstrates Connect's control over the Advantage Collateral. The

2  Advantage Collateral represents a benefit to Connect. Connect may have made a poor

3  bargain for itself in the Producer Agreement after it acquired the Advantage Collateral,

4  but this does not vitiate DZ Bank's claim for unjust enrichment.

5      Connect also argues, without any citation to the record, that any enrichment it

6  received was not unjust because the 10% portion of the commissions it received under the

7  Producer Agreement was a reasonable fee for the services it rendered, which "enhanced

8  the value of the collateral." (Con. Mot. at 21.) First, under the Producer Agreement, any

9  "services" that Connect performed were for the benefit of Advantage Pacific, not DZ

10  Bank. Thus, any "fee" that Connect received for those services is irrelevant to DZ

11  Bank's claim for unjust enrichment. DZ Bank's claim relates to the collateral itself and

12  the commissions derived from that collateral. Connect has admitted that it took

13  possession of the collateral by purchasing Advantage Pacific's book of business, and the

14  Producer Agreement itself demonstrates that Connect has the authority to direct the

15  disposition of any commissions arising from Advantage Pacific's book of business. *See*

16  *supra* § III.C.1. In any event, Connect cites no evidence in support of its assertion that its

17  "services" under the Producer Agreement "enhanced the value of the collateral." (*See*

18  Con. Mot. at 21.) Unsupported assertions by legal counsel in briefs are insufficient to

19  create an issue of fact for trial. *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1076 (9th Cir.

20  1999).

21      Finally, Connect asserts that "DZ Bank knew of Connect's involvement with

22  Advantage [Pacific] in April 2012, but failed to take action," and thus "silently

ORDER- 48

1    acquiesced" to Connect's "market access services." (Con. Mot. at 21.)  Connect argues

2    that DZ Bank "now seeks to benefit from [those services] without paying." (*Id.*)  Again,

3    Connect provides no evidence for its assertion that DZ Bank knew of Connect's

4    acquisition of the Advantage Collateral by April 2012.  Further, as DZ Bank points out,

5    Connect's "silent acquiescence" argument is not support by the law.  The case Connect

6    cites refers to the act of "silent acquiescence" as supporting a finding of unjust

7    enrichment where the party being unjustly enriched—here, Connect—was the party who

8    "silently acquiesced" to the event or services that allegedly enriched that party. (*See* Con.

9    Mot. at 21 (citing *Norton Builders, LLC v. GMP Homes VG, LLC*, 254 P.3d 835, 846

10   (Wash. Ct. App. 2011)).)

11         Based on the foregoing, as well as the undisputed facts discussed above regarding

12   DZ Bank's claim for conversion, the court grants DZ Bank summary judgment against

13   Connect as to liability on its unjust enrichment claim regarding the Advantage Collateral.

14   However, just as there are genuine issues of material fact with respect to the transfer of

15   the API Collateral and the amount of DZ Bank's damages, *see supra* §§ III.C.6., III.C.7.,

16   those same issues of fact remain as to DZ Bank's claim for unjust enrichment.  Those two

17   issues remain for trial.

18         **E.  Connect's Affirmative Defenses**

19         In its motion for summary judgment and its response to DZ Bank's motion,

20   Connect asserts a number of the affirmative defenses that it pleaded in its amended

21

22

1   answer.[27] (Con. Mot. at 24-25; Con. Resp. at 24-29.)  In addition, Connect asserts a

2   number of affirmative defenses in its memoranda on summary judgment that it had not

3   previously pleaded.  The court addresses those affirmative defenses, both pleaded and

4   unpleaded, below.  The court concludes that none of the affirmative defenses raised by

5   Connect in any of its memoranda entitle Connect to summary judgment on DZ Bank's

6   claims or prohibit the entry of partial summary judgment in DZ Bank's favor, as

7   described above.

8       The burden is on Connect to establish its affirmative defenses.  *See Jones v. Taber*,

9   648 F.2d 1201, 1203 (9th Cir. 1981) ("Of course, the burden is always on the party

10  advancing an affirmative defense to establish its validity.").  Because Connect bears the

11  burden of proof on its affirmative defenses, DZ Bank can meet its summary judgment

12  burden by "pointing out . . . that there is an absence of evidence to support the

13  nonmoving party's case." *Celotex*, 477 U.S. at 325.

14      **1.   Connect Lacks Standing to Assert Six of Its Affirmative Defenses**

15      On June 17, 2015, the court dismissed Connect's counterclaims for lack of

16  standing.  (6/17/15 Order (Dkt. # 28) at 8-12.)  In its counterclaims, Connect attempted to

17  assert claims that Advantage Pacific or API could have brought against one or more of

18  the Brooke entities or others.  The court concluded that Connect had no standing to assert

19  these claims and dismissed them pursuant to Federal Rule of Civil Procedure 12(b)(1).

20

21      [27] Connect asserts 20 affirmative defenses in its amended answer.  (Am. Ans. at 8-12.)  In

22  its briefing, Connect withdrew its second affirmative defense of accord and satisfaction.  (Con. Resp. at 29.)

ORDER- 50

1  (*Id.*)  DZ Bank had also moved to dismiss several of Connect's affirmative defenses on

2  essentially the same grounds.  (*See id.* at 17-18.)  However, because the parties had

3  provided insufficient briefing on whether the standing doctrine applies in the context of

4  affirmative defenses, the court declined to rule on the issue at that time.  (*Id.* at 17.)  The

5  parties have now provided sufficient briefing, and the court considers the issue on

6  summary judgment.

7          Just as it did in its now-dismissed counterclaims, Connect seeks to enforce through

8  several affirmative defenses Advantage Pacific's or API's rights, as if Connect were a

9  party to the original contracts with BCC or one of the other Brooke entities.  (*See* Am.

10  Ans. at 9-12 (Aff. Def. No. 3 ("Duress/Undue Influence"); Aff. Def. No. 4 ("Failure of

11  Consideration"); Aff. Def. No. 5 ("Lack of Consideration"); Aff. Def. No. 6 ("Fraud,

12  Deceit, or Misrepresentation by Plaintiff"); Aff. Def. No. 12 ("No Breach by Defendant")

13  (which is premised on no breach by Advantage Pacific or API); Aff. Def. No. 14

14  ("Unconscionability/Public Policy") (collectively "Brooke Affirmative Defenses")).)

15          If Connect was an assignee of Advantage Pacific or API with respect to the Notes

16  or Security Interests that Advantage Pacific or API entered into with BCC or other

17  Brooke entities, then Connect would likely have standing to assert Advantage Pacific's or

18  API's rights under those contracts.  *See Sprint Commc'ns Co., LP v. APCC Servs., Inc.*,

19  554 U.S. 269, 285-86 (2008); *Misic v. Bldg. Serv. Emps. Health & Welfare Tr.*, 789 F.2d

20  1374, 1378 (9th Cir. 1986) ("Many cases reflect the premise that a valid assignment

21  confers upon the assignee standing to sue in place of the assignor.").  Connect, however,

22  has not alleged that it is an assignee of the contract rights of either Advantage Pacific or

ORDER- 51

1   API. (*See generally* Am. Ans.)  Instead, Connect asserts a convoluted argument that if

2   "DZ Bank asserts that Connect's control and dominion is extensive enough to support

3   conversion," then it should be sufficient "to support Connect's affirmative defenses,

4   some of which are based on Advantage [Pacific's] rights." (Con. Resp. at 26.)  Connect

5   repeatedly argues that by attempting to enforce its security interests in the Advantage

6   Collateral and API Collateral, DZ Bank has somehow assumed the obligations of certain

7   Brooke entities as a franchisor, that Connect has become a "new debtor" vis-à-vis DZ

8   Bank, and that as a result Connect has standing to assert Advantage Pacific's or API's

9   rights under those entities' franchise agreements or other contracts with various Brooke

10   entities.  (*Id.*)  Just as it did with respect to its counterclaims, Connect confuses its

11   purchase, taking, or securing of assets, on the one hand, with an assumption of all rights

12   and obligations, on the other. (*See id.*)  Connect cites no authority for its novel argument,

13   and the court rejects it.

14        In any event, contrary to Connect's assertion, DZ Bank does not claim that

15   Connect is liable as "a new debtor" under either the API Security Agreement or the

16   Advantage Security Agreement (*see id.*), but rather as a tortfeasor that converted property

17   in which DZ Bank had a security interest—the API Collateral and the Advantage

18   Collateral (*see generally* Compl.).  As a non-party to the Notes and Security Interests,

19   which was never assigned any of the rights therein, Connect has no standing to assert

20   Advantage Pacific's or API's rights under those contracts. *See Lorber Indus. of Cal. v.*

21   *L.A. Printworks Corp.*, 803 F.2d 523, 524-25 (9th Cir. 1986) (ruling that corporation that

22   is neither a party to nor agent nor beneficiary of contract lacks standing to compel

1   contractual arbitration); *E.E.O.C. v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1543 n.2

2   (9th Cir. 1987) (ruling that an entity that was not a party to a settlement agreement lacked

3   standing to challenge the rights of a party to the agreement) (citing *Von Brimer v.*

4   *Whirlpool Corp.*, 536 F.2d 838, 841 n.1 (9th Cir. 1976) (assessing standing to assert

5   rights of others by considering "whether the person who brings the suit is a person

6   harmed by the alleged wrong")).  Indeed, the court previously ruled that Connect does not

7   have standing to contest those agreements or to assert Advantage Pacific's or API's rights

8   under those contracts.  (*See* 6/17/15 Order at 8-12.)

9          Further, it does not matter whether Connect is attempting to assert the contractual

10   rights of Advantage Pacific or API in the form of a counterclaim or an affirmative

11   defense.  In either instance, Connect must demonstrate standing.  *See United States v.*

12   *Hugs*, 109 F.3d 1375, 1378 (9th Cir. 1997) (ruling that defendants lacked standing to

13   assert affirmative defense based on an as-applied First Amendment challenge to agency

14   regulations); *United States v. Dunifer*, 997 F. Supp. 1235, 1239-40 (N.D. Cal. 1998)

15   (concluding that the defendant was required to demonstrate standing because "[w]here

16   the defendant asserts an affirmative defense requiring the litigation of issues not

17   encompassed in the plaintiff's case-in-chief, the defendant is in a similar situation on

18   those issues to a plaintiff who is invoking the jurisdiction of the court") (citing *FDIC v.*

19   *Main Hurdman*, 655 F. Supp. 259, 268 (E.D. Cal. 1987) (concluding that defendant must

20   have Article III standing to pursue an affirmative defense)); *United States v. Thirty Eight*

21   *(38) Golden Eagles or Eagle Parts*, 649 F. Supp. 269, 274, 276 (D. Nev. 1986), *aff'd*,

22   829 F.2d 41 (9th Cir. 1987) (ruling that the defendant lacked standing to bring affirmative

1    defense based on First Amendment as-applied challenge to agency regulations); *see also*

2    *United States v. Neset*, 10 F. Supp. 2d 1113, 1116 (D. N.D. 1998) ("In raising an

3    affirmative defense, a defendant is seeking the jurisdiction of the court to hear claims as

4    much as a plaintiff and, therefore, standing becomes an issue for the defendant as well.")

5    As noted above, the court previously ruled that Connect does not have standing to pursue

6    Advantage Pacific's or API's contractual rights. (*See* 6/17/15 Order at 8-12.)  Connect

7    has failed to provide any valid basis for the court to conclude otherwise with respect to its

8    Brooke Affirmative Defenses. (*See* Con. Resp. at 24-26.)  Accordingly, the court grants

9    DZ Bank's motion for summary judgment on Connect's Brooke Affirmative Defenses.

10        **2.  Connect Waived Its Abandonment Affirmative Defense**

11            Connect asserts in its motion for summary judgment that DZ Bank abandoned the

12    API Collateral and the Advantage Collateral by failing to sue A Plus, by failing to add

13    Connect and A Plus to the Advantage/API Case, by failing to seek an agreement with

14    Connect like the Soto Agreement, and by failing to take any action in Mr. Coley's

15    personal bankruptcy proceeding. (*See* Con. Mot. at 18-19.)  Abandonment is a complete

16    defense to conversion. *See Jones v. Jacobson*, 273 P.3d 979, 980 (Wash. 1954).

17            Connect raises this defense for the first time in its motion for summary judgment.

18    Connect did not assert abandonment as an affirmative defense. (*See* Am. Ans. 8-12.)

19    With limited exceptions, a party "is required to raise every defense in its first responsive

20    pleading, and defenses not so raised are deemed waived." *Morrison v. Mahoney*, 399

21    F.3d 1042, 1046 (9th Cir. 2005).  The court "has discretion to permit a defendant to raise

22    an affirmative defense for the first time in a motion for summary judgment 'only if the

1    delay does not prejudice the plaintiff.'" *Hernandez v. Creative Concepts, Inc.*, 295

2    F.R.D. 500, 504 (D. Nev. 2013) (quoting *Magana v. Commonwealth of the N. Mariana*

3    *Islands*, 107 F.3d 1436, 1446 (9th Cir. 1997)).  Further, because Connect seeks to raise

4    this affirmative defense after the scheduling order's cutoff for amended pleadings,

5    Connect must meet not just the liberal standard for amended pleadings in Federal Rule of

6    Civil Procedure 15(a), but the stricter "good cause" standard under Federal Rule of Civil

7    Procedure 16(b).  *See AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946,

8    952 (9th Cir. 2006); *Sadid v. Vailas*, 943 F. Supp. 2d 1125, 1140 (D. Idaho 2013) ("The

9    Court concludes that if a defendant seeks to assert new affirmative defenses in a motion

10   for summary judgment after the scheduling-order deadline for amending pleadings has

11   passed, then Rule 16(b)'s good-cause standard applies."); *Hernandez*, 295 F.R.D. at 504-

12   05; *see also Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992)

13   (noting once a district court files a pretrial scheduling order under Federal Rule of Civil

14   Procedure 16 establishing a timetable for amending pleadings, that rule's standards

15   control).

16          Unlike Rule 15(a)'s liberal amendment policy, which focuses on undue delay and

17   prejudice to the other party, Rule 16(b)'s "good cause" standard centers on the moving

18   party's diligence.  *Johnson*, 975 F.2d at 609.  A "district court may modify the pretrial

19   schedule 'if it cannot reasonably be met despite the diligence of the party seeking the

20   extension.'"  *Id.* (quoting Fed. R. Civ. P. 16 advisory committee's note (1983

21   amendment)).  "If that party was not diligent, the inquiry should end."  *Id.*

22

1    "[C]arelessness is not compatible with a finding of diligence and offers no reason for a

2    grant of relief." *Id.*

3         Only if the moving party is able to satisfy the good cause standard under Rule 16

4    should the court then examine whether amendment is proper under Rule 15(a). *Id.* at

5    607-08. Under Rule 15(a) "[i]n the absence of any apparent or declared reason—such as

6    undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to

7    cure deficiencies by amendments previously allowed, undue prejudice to the opposing

8    party by virtue of allowance of the amendment, futility of amendment, etc.—the leave

9    sought should, as the rules require, be 'freely given.'" *Eminence Capital, LLC v. Aspeon,*

10   *Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (quoting *Foman v. Davis*, 371 U.S. 178, 182

11   (1962)). However, "not all of the factors merit equal weight . . . [I]t is the consideration

12   of prejudice to the opposing party that carries the greatest weight." *Id.* at 1052.

13        In response to DZ Bank's argument that it waived its abandonment affirmative

14   defense, Connect offers no excuse for its failure to raise this defense prior to summary

15   judgment. (*See* Con. Reply at 4-5.) Connect does not assert that the evidence upon

16   which it bases this new defense was not previously available. (*See id.*) In the absence of

17   any excuse or justification by Connect regarding its late assertion of this defense, the

18   court must conclude that Connect was not diligent in raising its abandonment affirmative

19   defense. This alone is a sufficient ground to deny Connect's attempt to assert a new

20   affirmative defense at the summary judgment stage. *Id.* at 609.

21        In addition to Connect's lack of diligence, however, the court also declines to

22   permit Connect to assert the affirmative defense of abandonment at this late day in the

1 litigation because it will prejudice DZ Bank or cause undue delay under Rule 15(a).

2 Discovery is closed. (*See* Sched. Ord. at 1.) Trial is less than a month away. (*Id.*) It

3 would be unfair to require DZ Bank to oppose Connect's abandonment defense without

4 an opportunity for discovery. The only way to avoid this prejudice would be to reopen

5 discovery and reschedule the trial date. In addition to undermining the court's interest in

6 managing its docket, setting a new trial date at this juncture ignores the prejudice to DZ

7 Bank inherent in any significant change in the trial schedule. *See Solomon v. N. Am. Life*

8 *& Cas. Ins. Co.*, 151 F.3d 1132, 1139 (9th Cir. 1998) (affirming the denial of a motion to

9 amend made "on the eve of the discovery deadline" based, *inter alia*, on the prejudice

10 resulting from "re-opening discovery, thus delaying the proceedings"); *Texaco, Inc. v.*

11 *Ponsoldt*, 939 F.2d 794, 798-99 (9th Cir. 1991) (holding that, although the motion to

12 amend was filed more than four months before trial, the motion was properly denied

13 because discovery had closed and, as a result, defendant would be "unreasonably

14 prejudiced" by the addition of new claims); *cf. DCD Programs, Ltd. v. Leighton*, 833

15 F.2d 183, 187-88 (9th Cir. 1987) (holding that a new party named in an amended

16 complaint was not prejudiced where the case was "still at the discovery stage with no trial

17 date pending, nor ha[d] a pretrial conference been scheduled"). Based on the foregoing,

18 the court denies Connect's motion for summary judgment based on an abandonment

19 affirmative defense and grants DZ Bank's motion with respect to waiver of Connect's

20 abandonment affirmative defense.

21 //

22 //

### 3. Failure to Mitigate

Connect argues that DZ Bank failed to mitigate its damages. (*See* Con. Resp. at 27-28.)  Under Washington law, a plaintiff has no duty to mitigate damages in cases of intentional tort. *Desimone v. Mut. Materials Co.*, 162 P.2d 808, 884 (Wash. 1945); *Champa v. Wash. Compressed Gas Co.*, 262 P. 228, 231 (Wash. 1927); *Wilson v. Walla Walla*, 528 P.2d 1006, 1007 (Wash. Ct. App. 1974).  "Conversion is an intentional tort." *King v. Rice*, 191 P.3d 946, 955 (Wash. Ct. App. 2008).  Thus, Connect cannot assert DZ Bank's failure to mitigate damages as an affirmative defense in response to DZ Bank's action for conversion.

DZ Bank, however, also asserts a claim for unjust enrichment.  Connect bears the burden of proof on its affirmative defense that DZ Bank failed to mitigate its damages. *Cox v. Keg Rests. U.S., Inc.*, 935 P.2d 1377, 1380 (Wash. Ct. App. 1997) (citing *Young v. Whidbey Island Bd. of Realtors*, 638 P.2d 1235, 1238 (Wash. 1982)).  Connect asserts that DZ Bank failed to mitigate its damages because DZ Bank "was responsible for creating the forms that led to the integrated transactions for Advantage and API, and that all the forms were required by DZ Bank." (Con. Resp. at 27.)  The fact that DZ Bank drafted the underlying contracts with Advantage and API is not evidence that DZ Bank failed to mitigate its damages with respect to Connect's unjust enrichment through its acquisition of the Advantage Collateral and/or API Collateral.  Connect also argues that DZ Bank failed to mitigate its damages because "it failed to adhere to its own requirement for bi-annual due diligence visits." (*Id.*)  DZ Bank's Rule 30(b)(6) deponent testified that DZ Bank performed biannual due diligence trips to review Brooke

1    borrowers and their operations. (Probst Dep. at 225:5-226:17.) However, in the

2    Advantage/API Case, DZ Bank produced only two such reports for a two- or three-year

3    period. (*Id.* at 226:18-231:4.) Again, this evidence does not demonstrate that DZ Bank

4    failed to mitigate its damages with respect to Connect's unjust enrichment though its

5    acquisition of the Advantage Pacific Collateral and/or API Collateral. Whether DZ Bank

6    conducted due diligence reviews of the underlying transactions is irrelevant to Connect's

7    acquisition of the Advantage Collateral and/or API Collateral and its unjust enrichment

8    thereby. The evidence Connect relies upon for its failure to mitigate affirmative defense

9    does not raise a genuine issue of material fact with respect to DZ Bank's unjust

10   enrichment claim.

11       **4. Laches**

12       Connect asserts that DZ Bank's claims are barred by the doctrine of laches. (Con.

13   Mot. at 24; Con. Reply (Dkt. ## 104 (redacted), 106 (sealed)) at 5-8.) "Laches is an

14   extraordinary remedy to prevent injustice and hardship and should not be employed as 'a

15   mere artificial excuse for denying to a litigant that which . . . he is fairly entitled to

16   receive, when the assertion of the claim, though tardy, is within the time limited by

17   statute and the rights of no one have been prejudiced by the delay.'" *Brost v. L.A.N.D.,*

18   *Inc.*, 680 P.2d 453, 456 (Wash. Ct. App. 1984) (quoting *Crodle v. Dodge*, 168 P. 986,

19   990 (Wash. 1917) (italics in original omitted). To prevail on its laches argument,

20   Connect must establish that (1) DZ Bank had knowledge of the facts constituting its

21   causes of action or a reasonable opportunity to discover such facts; (2) there was an

22   unreasonable delay in commencing the action; and (3) the delay damaged Connect. *See*

1   *In re Marriage of Barber*, 23 P.3d 1106, 1110-11 (Wash. Ct. App. 2001).  "The main

2   component of the doctrine is not so much the period of delay in bringing the action, but

3   the resulting prejudice and damage to others."  *Cotton v. City of Elma*, 998 P.2d 339, 346

4   (Wash. Ct. App. 2000) (alterations omitted) (quoting *Clark Cty. Pub. Utility Dist. No. 1 v.*

5   *Wilkinson*, 991 P.2d 1161, 1166 (Wash. 2000).  The burden of proof is on the party

6   asserting laches as a defense.  *Rutter v. Rutter's Estate*, 370 P.2d 862, 865 (Wash. 1962).

7          Connect bases its laches argument on an alleged lack of access to evidence on

8   which to build its defense that Connect asserts has been caused by DZ Bank.  (Am. Ans.

9   at 10 ("[D]efendant's ability to defend this lawsuit has been severely prejudiced due to

10  [DZ Bank's] unreasonable delay by denying [Connect] access to documents or other

11  physical evidence; witnesses; and a reasonably fresh recollection of the events giving rise

12  to this lawsuit.");  Con. Mot. at 24;  Con. Reply at 5-7.)  Connect is essentially trying to

13  turn a discovery dispute into a laches defense.  Even assuming that this was an

14  appropriate basis for alleging laches, Connect's argument fails.  Connect failed to timely

15  serve discovery requests upon DZ Bank, and the court accordingly granted DZ Bank's

16  motion for a protective order.  (*See* Dkt. ## 47, 50, 53.)  "Generally speaking, where the

17  parties are equally at fault, neither can successfully assert laches against the other."

18  *Rutter*, 370 P.2d at 865.

19         Connect also tries to build a laches defense on allegations that (1) DZ Bank

20  "acquiesced" to Connect remaining Advantage Pacific's "agent of record," and (2) DZ

21  Bank knew of Brooke's fraud in 2008 "before Advantage Pacific had been damaged by

22  Brooke's failure to pay commissions" and "had it done acted then [sic], there would be

1   no collateral." (Con. Mot. at 24.) These assertions, even if true, do not establish the

2   main component of laches—namely, prejudice to Connect. *See Cotton*, 998 P.2d at 346.

3   The mere fact that DZ Bank acquiesced to Connect remaining an agent of record, even if

4   true, does not establish that Connect was prejudiced thereby. The fact that DZ Bank

5   knew of Brooke's fraud before Advantage Pacific was injured, even if true, might

6   establish prejudice with respect to Advantage Pacific but not with respect to Connect.

7   Essentially, Connect is arguing that if DZ Bank had acted sooner on its purported

8   knowledge concerning the Brooke entities, DZ Bank would not have entered into the

9   various loan and security agreements with Advantage Pacific and API, and Connect

10  would not have acquired the Advantage Collateral and/or the API Collateral because

11  neither Collateral would have existed. This line of reasoning is too attenuated to support

12  a laches defense.

13      **5.   Connect's Affirmative Defenses Based on Washington's Franchise Statute**

14          In a confusing passage in its response to DZ Bank's motion for summary

15  judgment, Connect argues that Washington's franchise statute, RCW 19.100.030,

16  provides the underpinning for its affirmative defenses of unclean hands,

17  unconscionability, duress/undue influence, failure of consideration, lack of consideration,

18  and illegality. (Con. Resp. at 28-29.) The court has already ruled that Connect lacks

19  standing to assert several of these affirmative defenses. *See supra* § III.E.1. To the

20  extent this argument is also premised on the notion that Connect has the right to enforce

21  Advantage Pacific's or API's rights under their franchise agreements with BCC or some

22  other Brooke entity, the court rejects it for the same reasons stated above. *See id.*

1          In any event, Connect fails to provide any evidentiary basis for its arguments

2   concerning Washington's franchise statute and its various affirmative defenses.  Without

3   citation to the record or any evidence, Connect asserts:

4          It is undisputed that DZ Bank, acting as Brooke's attorney-in-fact, refused
           to transfer the franchise rights, i.e. the right to be master agent, to
5          Advantage and API unless Advantage/API reaffirmed the full value of the
           related Notes and released all claims against Brooke.  They did so at a time
6          when they knew of Brooke's fraud, and knew that neither Brooke or DZ
           bank would ever provide franchise services.

7
           It is undisputed that Brooke failed to pay commissions from July 2008
8          onward.   But for DZ Bank's unlawful acts in withholding transfer,
           Advantage would not have experienced the loss of commissions from 2008-
9          2010, and would not have sought replacement market access services from
           Connect.

10
    (Con. Resp. at 28-29.)

11
           DZ Bank does not concede these facts.  (DZ Reply at 13 n.10.)  Connect's

12  counsel's assertions of the foregoing "facts," without citation to evidence in the record,

13  does not suffice at this stage of the proceedings. *British Airways Bd. v. Boeing Co.*, 585

14  F.2d 946, 952 (9th Cir. 1978) ("[L]egal memoranda and oral argument are not evidence,

15  and they cannot themselves create a factual dispute sufficient to defeat summary

16  judgment."); *Smith v. Mack Trucks, Inc.*, 505 F.2d 1248, 1249 (9th Cir. 1974) ("Legal

17  memoranda and oral argument, in the summary-judgment context, are not evidence, and

18  do not create issues of fact capable of defeating an otherwise valid motion for summary

19  judgment."); *Kim Seng Co. v. J & A Importers, Inc.*, 810 F. Supp. 2d 1046, 1059 (C.D.

20  Cal. 2011) ("[M]ere attorney argument does not defeat a properly supported summary

21  judgment motion."); *see also Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th

22

1   Cir. 2001) ("[A] district court is not required to comb the record to find some reason to

2   deny a motion for summary judgment.") (quotation marks omitted).  The court concludes

3   that Connect is neither entitled to summary judgment on these affirmative defenses, nor

4   do they create issues of fact that would alter the court's decision granting partial

5   summary judgment to DZ Bank.

### 6.  Connect's Remaining Undeveloped Affirmative Defenses

7        In addition to the foregoing affirmative defenses, Connect also raises several

8   others in a truncated and conclusory manner.  In a single sentence in a footnote and

9   without citation to the record, Connect asserts that the statute of limitations on DZ Bank's

10  tort claims has passed.  (Con. Mot. at 24, n.29.)  In three sentences and without citation to

11  the record or any authority other than Federal Rule of Civil Procedure 19, Connect asserts

12  DZ Bank failed to join A Plus Insurance and First State Bank as necessary parties.  (*Id.*

13  at 25.)  In two sentences, Connect asserts that DZ Bank's claims are barred by res

14  judicata.  (Con. Resp. at 29.)  Again, Connect provides no citation to the record.  (*Id.*)

15       A party waives or abandons an argument at the summary judgment stage by

16  failing to provide more than a passing remark in support of its position.  *See John-*

17  *Charles v. California*, 646 F.3d 1243, 1247 n.4 (9th Cir. 2011) (holding that a party

18  "failed to develop any argument on this front, and thus has waived it"); *Moreno Roofing*

19  *Co., Inc. v. Nagle*, 99 F.3d 340, 343 (9th Cir. 1996) (ruling that counsel's passing

20  remarks on an issue in opposition to summary judgment were insufficient to avoid

21  waiver); *United States v. Kimble*, 107 F.3d 712, 715 n.2 (9th Cir. 1997) (deeming an

22  argument "to have been abandoned" where the party fails to "coherently develop[ ]" it in

1  his briefs); *see also United States v. George*, 291 F. App'x 803, 805 (9th Cir. 2008)

2  (holding that a party's "failure to adequately develop . . . arguments in his brief operates

3  as a waiver"). Connect has waived its affirmative defenses of expiration of the statute of

4  limitations, failure to join a necessary or indispensable party, and res judicata by failing

5  to provide sufficient development in its briefing.

6          **F. Summary of the Court's Rulings**

7          In sum, the court concludes that DZ Bank is entitled to partial summary judgment

8  as follows: DZ Bank is entitled to summary judgment against Connect on liability for its

9  claims for conversion and unjust enrichment with respect to the Advantage Collateral.

10  However, genuine issues of material fact remain with respect to the extent of the transfer,

11  if any, of the API Collateral to Connect. In addition, genuine issues of material fact

12  remain with respect to DZ Bank's damages, and Connect will be permitted an

13  opportunity to cross-examine DZ Bank's damages expert(s) at trial. The court, therefore,

14  denies DZ Bank's motion for summary judgment with respect to these two issues and

15  reserves them for trial.

16          Based on the evidence cited and the analysis above, the court also concludes that

17  Connect is not entitled to summary judgment on any portion of DZ Bank's claims for

18  conversion or unjust enrichment. In its motion and response to DZ Bank's motion,

19  Connect asserted a number of affirmative defenses. The court concludes that none of the

20  affirmative defenses Connect raises in the course of its briefing on the parties'

21  cross-motions entitle Connect to summary judgment with respect to DZ Bank's claims or

22

1 | prevent the court from entering partial summary judgment in DZ Bank's favor, as

2 | described above.

3 |                                        IV.    CONCLUSION

4 |          Based on the foregoing, the court GRANTS in part and DENIES in part DZ

5 | Bank's motion for summary judgment (Dkt. ## 64, 66) and DENIES Connect's motion

6 | for summary judgment (Dkt. ## 73, 74).

7 |          Dated this 14th day of February, 2016.

8 |

9 |                                                    JAMES L. ROBART
                                                     United States District Judge

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

ORDER- 65