1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

DZ BANK AG DEUTSCHE
ZENTRAL-
GENOSSENSCHAFTSBANK,

11

12                    Plaintiff,

13          v.

14  CONNECT INSURANCE AGENCY,
    INC.,

15

                      Defendant.

16

CASE NO. C14-5880JLR

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

        On June 16, 2015, the court dismissed Defendant Connect Insurance Agency,

17  Inc.'s ("Connect") counterclaims with prejudice.  (Order (Dkt. # 28).)  On February 16,

18  2016, the court entered partial summary judgment in favor of Plaintiff DZ Bank AG

19  Deutsche Zentral-Genossenschaftsbank ("DZ Bank").  (SJ Ord. (Dkt. # 124).)  The

20  parties tried the remaining issues on March 7-8, 2016, before the court sitting without a

21  jury.  (Min. Entries (Dkt. ## 139-40).)  At trial, Connect was represented by Marc S.

22

Stern and Susan L. Fullmer, and DZ Bank was represented by Alex Darcy of Askounis & Darcy, PC, and Michael W. Johns of Roberts Johns & Hemphill, PLLC.  The court has considered the testimony presented at trial, the exhibits admitted into evidence, and the arguments of counsel.[1]  The court has weighed the testimony, exhibits, and other evidence using the required "preponderance of the evidence" standard.  Being fully advised, the court makes the following Findings of Fact and Conclusions of Law.[2]

## I.   FINDINGS OF FACT

### A.  Preliminaries

1.      The facts found in the court's order on cross motions for summary judgment are incorporated herein by reference.  (*See generally* SJ Ord.)

2.      The facts to which the parties stipulated in their joint proposed pretrial order are incorporated herein by reference.[3]  (*See* Pretrial Ord. at 3-13 ("Stip. Facts").)

---

[1] The parties also jointly submitted a pretrial order containing stipulated facts.  (Pretrial Ord. (Dkt. # 125).)  In addition, the parties filed trial briefs (Connect Tr. Br. (Dkt. # 134); DZ Bank Tr. Br. (Dkt. # 133); Connect Supp. Tr. Br. (Dkt. # 141)), proposed findings of fact and conclusions of law prior to trial (Connect Pr. Find. & Con. (Dkt. # 137); DZ Bank Pr. Find. & Con. (Dkt. # 136)), and amended proposed findings of fact and conclusions of law following trial (Connect Am. Pr. Find. & Con. (Dkt. # 143); DZ Bank Am. Pr. Find. & Con. (Dkt. # 142)).

[2] To the extent any findings of fact may be deemed conclusions of law, they shall also be considered conclusions.  Similarly, to the extent any conclusions as stated may be deemed findings of fact, they shall also be considered findings.  *See In re Bubble Up Del., Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982).

[3] Both Connect and DZ Bank presented and signed the proposed pretrial order in this matter.  (*See* Pretrial Ord. at 1-2 ("NOW COME . . . DZ Bank . . . and Connect . . . , by and through their respective counsel, and for their Proposed Pretrial Order, . . . state as follows"), 24.)  In this filing, the parties stipulate to a series of facts, but each party also notes objections to particular stipulated facts.  DZ Bank objects on grounds of relevance to "Admitted Facts" Nos. 9, 13-16, 16.1, 16.5, 17-22, 29, and 55-57.  (*See* Pretrial Ord. at 3-13.)  DZ Bank, however,

**B.  The Parties and Jurisdictional Facts**

3.      DZ Bank is a bank registered under the laws of the Federal Republic of Germany that maintains a place of business in New York, New York.  (Compl. (Dkt. #1) ¶ 1; Pretrial Ord. at 2.)

4.      "Connect is a citizen of the State of Texas and the State of Florida with [its] principal place of business in Mansfield, Texas, and Royal Palm Beach, Florida." (Pretrial Ord. at 2; *see also* Am. Ans. (Dkt. # 10) ¶ 65 (admitting Connect is a Texas corporation with a principal place of business in Texas).)  In DZ Bank's motion for summary judgment, DZ Bank asserted that Connect is incorporated in both Florida and Texas and has a principal place of business in both states.  (DZ SJ Mot. (Dkt. ## 64 (redacted), 66 (sealed), at 2.)  Connect did not dispute these facts in its response to DZ Bank's motion.  (*See* Con. Resp. (Dkt. ## 91(redacted), 94 (sealed)) at 4-5 (identifying disputed facts).)

5.      At trial, Jeremy Pool testified that he is the Chief Executive Officer ("CEO") of Connect in both Texas and Florida.  Mr. Pool also testified that the Connect that is incorporated in Texas is a separate corporation from the Connect that is incorporated in Florida.  In light of Connect's admission in the parties' proposed pretrial

---

specifically incorporates the parties' stipulated facts, without reference to any objections, into DZ Bank's proposed findings and conclusions and its proposed amended findings and conclusions.  (DZ Bank Pr. Find. & Con. at 1; DZ Bank Am. Pr. Find & Con. at 1.) Accordingly, the court concludes that DZ Bank has waived its objections to any of the parties' stipulated facts. Connect objects on grounds of the best evidence rule and hearsay to Admitted Facts Nos. 8, 10, 12, 23, 25, and 38, and on grounds of relevance to Admitted Facts Nos. 9, 13-15, and 24.  (*See* Pretrial Ord. at 3-13.)  The court has considered Connect's objections and overrules them.

1   order that Connect is incorporated and has a principal place of business in both Texas and

2   Florida, the court does not find this portion of Mr. Pool's testimony to be credible.  The

3   court finds that Connect is single corporate entity that is incorporated and operating in

4   both Texas and Florida.[4]

5       6.      DZ Bank's claim against Connect exceeds $75,000.00, exclusive of

6   interest and costs.

7   **C. Credibility Determinations**

8       7.      The court finds that the testimony of Mr. Pool generally lacks credibility.

9   On a number of occasions, Mr. Pool's testimony conflicted with the documentary

10  evidence in this case or with the testimony of other witnesses, such as David Coley

11  (whose testimony was entered into the record by his deposition transcript) and DZ Bank's

12  witnesses.  Thus, to the extent that Mr. Pool's testimony conflicted with the testimony of

13  other witnesses or the documentary evidence in this case, the court credits the testimony

14  of the other witnesses or the facts as they appear in the documents rather than Mr. Pool's

15  testimony.

16      8.      The court finds that the testimony of Mr. Coley also lacks credibility in

17  certain respects.  Mr. Coley repeatedly testified that he could not remember key facts

18  concerning the two companies of which he was the sole manager and owner.  His

19

20  ---

    [4] A single company may be incorporated in more than one state.  *See, e.g.*, *McGovern v.*
21  *Am. Airlines, Inc.*, 511 F.2d 653, 654 (5th Cir. 1975) (noting that incorporation in more than one
    state is "a viable possibility"); *see also* 13 Charles A. Wright, et al., <u>Federal Practice and</u>
22  <u>Procedure</u> § 3626 (3d ed. 1998) (discussing diversity jurisdiction in the context of corporations
    incorporated in more than one state).

testimony was also internally contradictory at numerous points.  Finally, like Mr. Pool's testimony, the testimony of Mr. Coley often conflicted with the documentary evidence in this case or with the testimony of DZ Bank's witnesses.  Thus, to the extent that Mr. Coley's testimony conflicts with the testimony of witnesses presented by DZ Bank or the documentary evidence in this case, the court credits the testimony of DZ Bank's witnesses or the facts as they appear in the documents rather than Mr. Coley's testimony.

9.     The court finds that, except for the fact that Mr. Cedric Probst is employed by DZ Bank, he has no personal stake in the outcome of this litigation and his testimony is generally credible.

10.     The court finds that, other than being hired by DZ Bank as an expert witness in this case, Brianne Giovannini has no stake in the outcome of this litigation and her testimony is generally credible.

**D. Advantage Pacific Insurance, Inc. and API Vancouver Insurance, Inc.**

11.     On February 29, 2008, Advantage Pacific Insurance, Inc. ("Advantage Pacific") acquired the insurance agency assets of two Brooke Insurance franchises (the "Advantage Agency Assets").  Advantage Pacific financed its acquisition of the two Brooke Insurance franchises under a note and loan agreement (the "Advantage Pacific Note") with Brooke Credit Corporation ("BCC") (d/b/a Aleritas Capital Corporation), as lender.  The Advantage Pacific Note was secured by Advantage Pacific's grant to BCC of a blanket security interest in all of Advantage Pacific's personal property, including client accounts and rights to payment, and all proceeds therefrom (collectively, the "Advantage Collateral"), pursuant to a Commercial Security Agreement (the "Advantage Pacific

1   Security Agreement").  (*See* SJ Ord. at 4:6-5:24; Stip. Facts ¶¶ 8, 10.)  The Advantage

2   Collateral includes general intangibles such as client lists.  (*See* SJ Ord. at 5:9-10.)  The

3   Advantage Collateral includes all assets then owned and thereafter acquired.

4         12.     On February 27, 2008, BCC filed a Uniform Commercial Code ("UCC")

5   Financing Statement with the Washington State Secretary of State (the "Advantage

6   Pacific Financing Statement").  (*See id.* at 5:16-19; Stip. Facts ¶ 11.)

7         13.     Mr. Coley guaranteed Advantage Pacific's obligations under the Advantage

8   Pacific Note pursuant to a guaranty (the "Advantage Pacific Guaranty").  (*See* SJ Ord. at

9   5:1-2; Stip. Facts ¶ 9.)

10        14.     While Advantage Pacific was operating, Mr. Coley was its sole owner and

11  operator.  (*See* SJ Ord. at 5 n. 2; Stip. Facts ¶ 26.)

12        15.     On June 27, 2008, API Vancouver Insurance, Inc. ("API") acquired the

13  insurance agency assets of former Brooke insurance franchise no. 948, which included

14  the former agency's book of business (the "API Agency Assets").  API's acquisition was

15  pursuant to API's assumption of prior Brooke franchisee CrullADD, Inc.'s note and loan

16  agreement with lender BCC, which was dated October 31, 2007 (the "API Amended

17  Note 6486").  API Amended Note 6486 was secured pursuant to a commercial security

18  agreement (the "API Security Agreement") under which API granted to BCC a blanket

19  security interest in all of API's personal property, including the API Agency Assets,

20  client accounts and rights to payment, and all proceeds therefrom (collectively, the "API

21  Collateral").  (*See* SJ Ord. at 6:11-9:5; Stip. Facts ¶¶ 12, 23.)  The API Collateral includes

22

1  general intangibles, which includes client lists.  (*See* SJ Ord. at 5:9-10.)  The API

2  Collateral includes all assets then owned or thereafter acquired.

3    16.    On July 1, 2008, BCC filed a UCC Financing Statement with the

4  Washington State Secretary of State (the "API Financing Statement," and collectively

5  with the API Security Agreement, the "API Security Interest").  (*See id.* at 9:5-10; Stip.

6  Facts ¶ 30.)

7    17.    Mr. Coley guaranteed API's obligations under API Amended Note 6486

8  pursuant to a guaranty (the "API Guaranty").  (*See* SJ Ord. at 8:6-7; Stip. Facts ¶ 24.)

9    18.    Mr. Coley was API's sole owner and operator.  (*See* SJ Ord. at 5 n. 6; Stip.

10  Facts ¶ 27.)

11    19.    Beginning in 2004, pursuant to a financing arrangement (as amended from

12  time to time) between DZ Bank as agent for Autobahn Funding Company, LLC

13  ("Autobahn"), Autobahn as lender, BCC as seller, and Brooke Credit Funding ("BCF")

14  as borrower, the Advantage Pacific Note and API Amended Note 6486 (collectively, the

15  "Notes"), as well as the Advantage Pacific Security Agreement and API Security

16  Agreement (collectively, the "Security Agreements") were all pledged to DZ Bank as

17  security.  (*See* SJ Ord. at 2:16-4:5, 5:11-19, 6:1-10, 6:16-7:2, 9:7-10; Stip. Facts ¶¶ 1-7.)

18  The Advantage Pacific Note and Note 6486 were pledged to DZ Bank in February 2008

19  and November 2007, respectively.  (*See* SJ Ord. at 5:4-19, 6:16-7:2.)

20    20.    In October 2008, DZ Bank foreclosed upon its security interest in BCC and

21  BCF, and the Notes and Security Agreements were assigned to DZ Bank.  (*See id*. at

22  9:11-10:7; Stip. Facts ¶¶ 31-38.)

1       21.     To further demonstrate DZ Bank's interest in the Advantage Pacific Note,

2   BCC's financing statement was amended on April 14, 2008, to include DZ Bank as the

3   secured party (the "Amended Advantage Financing Statement").  (*See* SJ Ord. at 10:7-10;

4   Stip. Facts ¶ 39.)

5       22.     In October 2008, Brooke Corporation and Brooke Capital Corporation filed

6   for Chapter 11 bankruptcy in the Bankruptcy Court for the District of Kansas, Case No.

7   08-22789.  (*See* SJ Ord. at 10:18-22; Stip. Facts ¶ 40.)

8       23.     Although Brooke no longer served as franchisor, Advantage Pacific and

9   API remained in the insurance business.  (*See* SJ Ord. at 10:25-11:2.)  According to

10  Advantage Pacific and API's tax returns, Advantage Pacific and API had gross receipts in

11  2008 of $55,606.00 and $104,544.00, respectively, gross receipts in 2009 of $239,226.00

12  and $60,284.00, respectively, and gross receipts in 2010 of $276,930.00 and $56,768.00,

13  respectively.  All revenue generated by the entities was related to the insurance

14  commissions earned by Advantage Pacific and API from selling insurance policies to

15  consumers.

16  **E. Transfer of Advantage Pacific and API to Connect**

17      24.     Pursuant to an agreement in 2010 that was effected by the Producer

18  Agreement executed January 1, 2011, Connect acquired Advantage Pacific's book of

19  business.  (*See* SJ Ord. at 12:1-13:5; Stip. Facts ¶ 52.)

20      25.     To effectuate the transfer of Advantage Pacific's book of business to

21  Connect, Connect and Advantage Pacific executed a series of letters to the insurance

22  carriers for which Advantage Pacific wrote business that directed the carriers to transfer

1    the producer codes to Connect's ownership and directed the carriers to pay all

2    commissions to Connect.  (*See* SJ Ord. at 2:12-22.)

3        26.    By January 2011, although he continued to file separate tax returns for

4    Advantage Pacific and API, Mr. Coley nevertheless managed Advantage Pacific and API

5    as one company, with bank accounts solely in the name of Advantage Pacific.  Besides

6    the sale to Connect, Mr. Coley did not make any other transfers of the API assets.  API

7    merged into Advantage Pacific prior to the sale of Advantage Pacific to Connect.

8        27.    DZ Bank maintains in its business records a client list, dated October 2008,

9    that DZ Bank retrieved from the Brooke Management System ("BMS"), which identifes

10    the API Agency Assets that API acquired from Brooke (the "API Client List").  The API

11    Client List refers to Brooke Franchisee No. 948, which was the number assigned to API.

12        28.    DZ Bank procured the API Client List from the BMS in October 2008,

13    when DZ Bank obtained the collateral records for each Brooke franchise entity whose

14    notes and related security agreements were pledged to DZ Bank pursuant to DZ Bank's

15    secured financing transaction with BCC and BCF.  DZ Bank maintains the API Client

16    List in its files in the ordinary course of its business.  The API Client List is the type of

17    document that DZ Bank relies upon in the ordinary course of its business, because DZ

18    Bank takes security interests in its customers' (here, BCC's and BCF's) assets pursuant to

19    secured lending transactions and relies upon its customers to accurately identify their

20    assets, such as accounts receivable,  in their business records.  The API Client List

21    identifies API's customers and related insurance policies.  The API Client List is

22    necessarily the type of record that Brooke Corporation, as BCC's and BCF's agent, had a

significant interest in recording accurately so that Brooke Corporation could properly account for API's commissions and so BCC and BCF could identify assets pledged to them by API.  DZ Bank has a substantial interest in the accuracy of its customer's documents, including the API Client List, so that DZ Bank can accurately identify the collateral pledged to DZ Bank to secure its loans.

29.   At trial, Connect failed to establish that the API Client List lacks trustworthiness.

30.   Connect's annual commission reports, dated from January 2011 through July 23, 2015, and related to the Advantage Pacific transaction (the "Connect Client List"), identify the clients transferred from Advantage Pacific to Connect.

31.   A comparison of the API Client List to the Connect Client List reflects that 563 of API's customers appear on both lists.

32.   The API Collateral was included in the sale between Connect and Advantage Pacific, even though API is not a party to the transaction.

**F. Value of the API and Advantage Pacific Collateral**

33.   The uncontested testimony of DZ Bank's expert witness, Ms. Giovannini, established the range of the fair market value of the collateral.  At the time of the sale between Advantage Pacific and Connect on January 1, 2011, the fair market value of Advantage Pacific's book of business was between $275,000.00 and $350,000.00, and the fair market value of API's book of business was between $60,000.00 and $100,000.00.  The low-end market values, $275,000.00 and $60,000.00, respectively, are consistent with Connect and Advantage Pacific's contractual formula in the Producer

1  Agreement, which values the book of business based on the sum of 12 consecutive

2  months of gross commissions, starting 13 months prior to the date of sale.

3       34.    Connect failed to justify its argument that Advantage Pacific and API's

4  respective debts to DZ Bank should be factored in to determining the market value of the

5  collateral.

6       35.    Connect concedes that an account's commission equals approximately

7  $100.00.  Based on this concession, the value of API's book of business is at least

8  $56,300.00 ($100.00 multiplied by 563 names equals $56,300.00).  This value, however,

9  does not factor in that certain customers may have had multiple policies from which

10  commissions would be paid.

11       36.    The highest market value for the combined Advantage Pacific Collateral

12  and API Collateral as of January 1, 2011, is $450,000.00, and the lowest is $335,000.00.

13       37.    DZ Bank is entitled to recover prejudgment interest from January 1, 2011,

14  to the date of entry of judgment.

15  **G. Findings Related to Connect's Willfulness**

16       38.    When Connect entered into the Producer Agreement, Mr. Pool, the CEO

17  and part owner of Connect, had actual knowledge of DZ Bank's interest in the Advantage

18  Collateral and/or the Advantage book of business.  Mr. Pool is a former Brooke

19  franchisee, and he served on Brooke's franchisee counsel representing Brooke agents

20  throughout the country as the "voice for the agents on the franchise side."  (*See* SJ Ord. at

21  11:3-7; Stip. Facts ¶¶ 48-49.)  Beginning in 2008, Mr. Pool had contact with Mr. Coley

22  over many months regarding their shared experiences and concerns over Brooke's failure,

1  Mr. Coley's work with DZ Bank regarding the Notes, and whether Mr. Coley should

2  fight DZ Bank.  (*See* SJ Ord. at 11:8-12.)  Mr. Pool knew that Advantage Pacific was a

3  former Brooke franchisee.  (*See* SJ Ord. at 11:12-13; Stip. Facts ¶ 50.)  Additionally,

4  pursuant to his role on Brooke's franchise council, Mr. Pool spoke directly with

5  representatives from DZ Bank during Brooke's bankruptcy, and Mr. Pool knew that DZ

6  Bank was a bank related to the Brooke transaction.  (*See* SJ Ord. at 11:13-16.)

7        39.      Mr. Pool also had personal knowledge that Brooke franchisee loans

8  secured by BCC were pledged to BCC's lender banks, including DZ Bank.  In 2009, Mr.

9  Pool, his Brooke franchise company Jeremy Pool Agency, Inc., Connect's co-owner

10  Alicia Pool, along with over 100 other Brooke franchisees, unsuccessfully sued BCC

11  (n/k/a Aleritas) and its lender banks, including DZ Bank, for fraud, negligent

12  misrepresentation, civil RICO violations, and tortious interference with contract (the

13  "2009 Litigation").  These plaintiffs, including Mr. Pool, alleged that Aleritas "assigned,

14  transferred or otherwise delegated Plaintiffs' loans or portions of Plaintiffs' loans to

15  various lending institutions, including but not limited to, the Bank Defendants."  *See*

16  *Alderidge v. Aleritas Capital Corp*., No. 09-CV-02178-CM-KGS, Dkt. # 23 (D. Kan.

17  2009).  In the 2009 Litigation, Mr. Pool also sought a preliminary injunction against the

18  banks to prevent them from collecting the franchisees' debts to Aleritas pursuant to the

19  assignment of those debts to the banks.  *Id*., Dkt. # 25.  By February 2010, before

20  Connect had contracted with Advantage Pacific, the Kansas federal district court

21  dismissed the 2009 Litigation against Aleritas and the banks for failure to state a claim.

22  *Id*., Dkt. # 99.

40.     When Connect entered the Producer Agreement, Connect had constructive knowledge of DZ Bank's interest in the Advantage Collateral pursuant to the Amended Advantage Financing Statement, which was then on file with the Washington Secretary of State and identified DZ Bank as creditor.  (Stip. Facts ¶¶ 11, 39.)

41.     Advantage Pacific represented in the Producer Agreement that all contractual obligations affecting its book of business have been or will be fulfilled.  To the extent Connect relied upon Advantage Pacific's representation, Connect's reliance was in reckless disregard of Connect's actual and constructive knowledge:  1) that the Advantage Collateral was pledged to DZ Bank; and 2) of the high likelihood that the collateral was pledged to DZ Bank based upon Mr. Pool's knowledge of the 2009 Litigation.  There is no evidence that Mr. Coley or Advantage Pacific produced any release to Connect to confirm that Advantage Pacific's assets were not pledged even though Connect knew the assets were likely encumbered by one of BCC's lender banks.  Although Mr. Pool was exposed to a vast number of Brooke franchisees, he could identify only one which did not have a loan secured by BCC.

42.     Connect did not conduct any due diligence prior to entering into the Producer Agreement.  (*See* SJ Ord. at 14:6-7; Stip. Facts ¶ 51.)

43.     DZ Bank did not consent to Connect and Advantage Pacific's entry into the Producer Agreement.  (*See* SJ Ord. at 14:7-8; Stip. Facts ¶ 51.)

44.     Connect did not pay DZ Bank for the Advantage Pacific Collateral or API Collateral.  (*See* SJ Ord. at 14:9-11; Am. Ans. ¶ 39.)

45.     By letter dated May 31, 2013, DZ Bank demanded that Connect pay DZ Bank for Connect's purchase of the Advantage Collateral without DZ Bank's consent (the "2013 Demand").  There is no evidence that Connect responded to the 2013 Demand.

46.     Connect's conversion of the Advantage Pacific Collateral and API Collateral was willful.

**H. Other Findings Related to DZ Bank's Damages**

47.     Connect collected hundreds of thousands of dollars in commissions related to its acquisition of Advantage Pacific's assets.  (*See* SJ Ord. at 14:11-13.)  Between January 2011, and July 23, 2015, Connect collected over $700,000.00 in commissions.

48.     On October 25, 2011, DZ Bank filed a complaint against Advantage Pacific, API, and Mr. Coley in the United States District Court for the Western District of Washington as Case No. 11-05879-BHS, which alleged the defendants breached the Notes and guaranties (the "Advantage Case").  (*See id*. at 16:8-11; Stip. Facts ¶ 42.)

49.     On May 24, 2012, the court in the Advantage Case granted final default judgment in favor of DZ Bank and against Advantage Pacific in the amount of $214,678.38, and against API in the amount of $327,689.21 (the "Advantage Judgment"). (*See* SJ Ord. at 16:11-14; Stip. Facts ¶ 44.)

50.     By letter dated May 31, 2013, DZ Bank demanded that Connect pay DZ Bank for Connect's purchase of the Advantage Collateral without DZ Bank's consent (the "2013 Demand").  Connect did not respond to the 2013 Demand.

51.     DZ Bank has not been paid for the collateral or pursuant to the Advantage Judgment by Connect, Advantage Pacific, API or any other third party.

52.     DZ Bank has been damaged in the amount of $450,000.00, plus prejudgment interest calculated at the statutory rate from January 1, 2011, to the date of entry of judgment, plus costs.

## II.     CONCLUSIONS OF LAW

1.     The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2), because the parties consist of a citizen of a state and a citizen or subject of a foreign state, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

2.     The law of Washington State applies to the substantive issues in this matter. (*See* SJ Ord. at 18-19.)

3.     DZ Bank has a perfected security interest in the Advantage Collateral, which includes a blanket security interest in all of Advantage Pacific's personal property, including the Advantage Agency Assets, client accounts and rights to payment, and all proceeds therefrom, and general intangibles, including client accounts. (*See id.* at 5:4-19, 22 n.16, 38:9-12.)

4.     DZ Bank has a perfected security interest in the API Collateral, which includes a blanket security interest in all of API's personal property, including the API Agency Assets, client accounts and rights to payment, and all proceeds therefrom. (*See id.* at 9:1-10, 38:9-12.)  The API Agency Assets include substantially all of the assets of

ORDER- 15

1   API's successor, CrullADD, Inc., doing business as Brooke Insurance Franchise No. 948,

2   including the agency's book of business.  (*See id.* at 7:7-8:2.)

3       5.      Connect is liable to DZ Bank for conversion and unjust enrichment related

4   to the Advantage Collateral secured by DZ Bank by virtue of Connect's purchase of

5   Advantage Pacific's book of business, including all of its client accounts, pursuant to (a)

6   an agreement in principal in 2010, which was effected by the Producer Agreement

7   executed January 1, 2011, and (b) subsequent letters to insurance carriers directing the

8   carriers to transfer Advantage Pacific's producer codes to Connect's ownership and

9   directing the carriers to pay all commissions to Connect.  (*See id.* at 12:1-13:11,

10  22:13-15, 65:7-9.)

11      6.      DZ Bank must prove its conversion and unjust enrichment claims by a

12  preponderance of the evidence.  *Grays Harbor Cty. v. Bay City Lumber Co.*, 289 P.2d

13  975, 979 (Wash. 1955) (conversion); Wash. Pattern Jury Instr. Civ. WPI 301A.02 (6th

14  ed.) (unjust enrichment).  DZ Bank must also prove willful conversion by a

15  preponderance of the evidence.  *Grays Harbor Cty.*, 289 P.2d at 979.

16      7.      The precise amount of DZ Bank's damages need not be shown with

17  mathematical certainty; rather, the damages must be based upon competent evidence,

18  which is sufficient if it affords a reasonable basis for estimating the loss and does not

19  subject the trier of fact to mere speculation and conjecture.  *Fed. Signal Corp. v. Safety*

20  *Factors, Inc.*, 886 P.2d 172, 188 (Wash. 1994); *Harmsen v. Smith*, 693 F.2d 932, 945 (9th

21  Cir. 1982) (accord).

22

8.      Because the court found that (1) DZ Bank maintains the API Client List in its files in the ordinary course of its business, (2) the API Client List is the type of document that DZ Bank relies upon in the ordinary course of its business, (3) DZ Bank has a substantial interest in the accuracy of its customer's documents, including the API Client List, and (4) Connect failed to establish that the API Client List lacks trustworthiness (*see supra* Finding of Fact Nos. 28-29), the API Client List is admissible. *See MRT Constr. Inc. v. Hardrives, Inc.*, 158 F.3d 478, 483 (9th Cir. 1998); *see also Davis v. CACH, LLC*, No. 14-CV-03892-BLF, 2015 WL 913392, at *5 (N.D. Cal. Mar. 2, 2015) (applying *Hardrives* in the context of the defendant's attempt to collect on a debt); Fed. R. Evid. 803(6).

9.      Because the court held that the transfer of the Advantage Collateral constituted conversion and because the court finds that the API Collateral was transferred to Connect with the Advantage Collateral, DZ Bank is entitled to damages for its conversion and unjust enrichment claims for the value of the combined Advantage Collateral and API Collateral.

10.     DZ Bank's security interest extends to all of the Advantage Collateral and API Collateral that was transferred to Connect because the security interest granted by Advantage Pacific and API included all assets then owned and thereafter acquired.  Thus, DZ Bank's security interest is not limited to the Advantage Pacific Agency Assets or API Agency Assets acquired from Brooke.

11.     DZ Bank is entitled to recover monetary damages for conversion.  *Potter v. Wash. State Patrol*, 196 P.3d 691, ¶ 16 (Wash. 2008).  DZ Bank is entitled to "recover *at*

*least* [the property's] value at the time of conversion." *In re Marriage of Langham &*

*Kolde*, 106 P.3d 212, 220 (Wash. 2005) (emphasis in original).  The measure of damages

depends upon whether the conversion was unintentional or willful.

> Absent willful misconduct, the measure of damages for conversion is the fair market value of the property at the time and place of conversion.  Fair market value is the value for which the property could have been sold in the course of a voluntary sale between a willing buyer and a willing seller, taking into account the use to which the property is adapted or could reasonably be adapted.

*Potter*, 196 P.3d 691, ¶ 15 (internal citation omitted).  Alternatively, in a willful

conversion, "the measure of damages is the highest market value of the property within a

reasonable time after the conversion, or, as sometimes stated, the highest price shown

between the time of the conversion and the institution of the suit." *Glaspey v. Prelusky*,

219 P.2d 585, 587-88 (Wash. 1950).  In contrast to willful conversion, ordinary

conversion is one that is unintentional and inadvertent.  *Crutcher v. Scott Pub. Co.*, 253

P.2d 925, 932 (Wash. 1953).

12.     To establish willful conversion by a preponderance of the evidence, "it

should be shown that the defendant either intended to deprive the plaintiff of his property,

or, having knowledge of facts sufficient to put him on notice of the plaintiff's ownership,

acted in reckless disregard of the probable consequences." *Grays Harbor Cty.*, 289 P.2d

at 979.  A defendant's act has been characterized as willful when "he either knew that the

property in question did not belong to him or had notice of an adverse claim." *Id*. at 980.

13.     DZ Bank is entitled to recover heightened damages for willful conversion

because Connect's conversion of the collateral was willful.  Connect's intentional

1    acquisition of the collateral is demonstrated by Connect's written contract (the Producer

2    Agreement) with Advantage Pacific and Connect's letters to various insurance carriers to

3    directing them to designate Connect as the owner of the accounts.  Furthermore,

4    Connect's actual knowledge of DZ Bank's security interest is demonstrated by:  Mr.

5    Pool's role on Brooke's franchisee council and within Brooke's bankruptcy; DZ Bank's

6    position as one of Brooke's largest creditors; Mr. Pool's understanding, as a result of his

7    involvement in the 2009 Litigation, of the pledged nature of BCC's (Alteritas's) interest

8    in the franchisees' loans, including loans with DZ Bank; Mr. Pool's conversations with

9    Mr. Coley regarding Mr. Coley's secured debts to DZ Bank; and DZ Bank's publicly

10   filed financing statement reflecting its security interest in all of Advantage Pacific's

11   assets.

12        14.      Connect had actual knowledge of DZ Bank's interest in the Advantage

13   Pacific Collateral because Mr. Pool's actual knowledge of DZ Bank's interest in the

14   collateral is imputed to Connect.  *See e.g.*, *Hurlbert v. Gordon*, 824 P.2d 1238, 1243

15   (Wash. Ct. App. 1992) ("Under general theories of agency, notice given to and

16   knowledge acquired by an agent is imputed to the principal as a matter of law."); *Raynor*

17   *v. Scandinavian-Am. Bank*, 210 P. 499, 503 (Wash. 1922) ("The knowledge of the

18   president was the knowledge of the bank.").

19        15.      Connect also had constructive notice of DZ Bank's interest in the collateral

20   by virtue of the Amended Advantage Financing Statement recorded in 2008, which

21   identified DZ Bank as the secured party.  *See e.g.*, *Top Line Equip. Co. v. Nat'l Auction*

22   *Serv., Inc.*, 649 P.2d 165, 168 (Wash. Ct. App. 1982) (constructive notice found because

1    of UCC filing).  Because Mr. Coley had merged the assets of API with Advantage

2    Pacific, the Advantage Pacific Financing Statement controls to perfect DZ Bank's

3    secured interest in all of the collateral that Mr. Coley or Advantage Pacific transferred to

4    Connect.  However, DZ Bank's interest in the API Financing Statement remained

5    perfected, notwithstanding the lack of any UCC filing identifying DZ Bank as the secured

6    party, pursuant to RCW 62A.9A-310(c).  The filed financing statements gave "notice to

7    the world that the designated parties have entered into a secured transaction covering

8    described collateral.  Like a recorded deed, the statement invites further inquiry by one

9    reading it."  *W. Wash. Laborers-Emp'rs Health & Sec. Tr. Fund v. Harold Jordan Co.*,

10   760 P.2d 382, 385 (Wash. Ct. App. 1988) (internal citation omitted).  Nonetheless,

11   Connect acquired the Advantage Collateral without obtaining DZ Bank's consent.

12          16.    Connect's failure to respond to DZ Bank's 2013 Demand related to the

13   Advantage Collateral further demonstrates that Connect's conversion was willful and not

14   inadvertent.

15          17.    Under Washington law, "the general rule in actions of trover and

16   conversion is that interest is allowed from the date of the conversion."  *Grays Harbor*

17   *Cty.*, 289 P.2d at 982.  This rule applies even if the amount of liability must be

18   determined by opinion evidence of the market value.  *Id*. at 981; *see also Rayonier, Inc.*

19   *v. Polson*, 400 F.2d 909, 921-22 (9th Cir. 1968) (applying *Grays Harbor* and affirming

20   allowance of interest from date of conversion even though the amount of liability could

21   only be determined by expert or opinion evidence).  "Prejudgment interest is allowed in

22

ORDER- 20

1  civil litigation at the statutory judgment interest rate." *Mahler v. Szucs*, 957 P.2d 632,

2  649 (Wash. 1998) (citing RCW 4.56.110).

3       18.    The Washington statutory judgment interest rate related to tortious conduct

4  by an individual or entity is "two percentage points above the prime rate, as published by

5  the board of governors of the federal reserve system on the first business day of the

6  calendar month immediately preceding the date of entry [of judgment]."  RCW

7  4.56.110(a)(3).

8       19.    DZ Bank is entitled to recover prejudgment interest on its conversion claim

9  calculated from January 1, 2011, to the date of entry of judgment calculated at the rate of

10  two percentage points above the prime rate, as published by the board of governors of the

11  federal reserve system on the first business day of the calendar month immediately

12  preceding the date of entry of judgment.

13       20.    As a result of Connect's willful conversion of the Advantage Pacific

14  Collateral and API Collateral, DZ Bank was damaged in the amount of $450,000.00, plus

15  prejudgment interest calculated from January 1, 2011, to the date of entry of judgment at

16  the statutory rate, plus costs.

17       21.    Because the API Collateral was included in the transfer of the Advantage

18  Collateral to Connect, Connect is liable to DZ Bank for unjust enrichment related to the

19  API.

20       22.    As a result of Connect's unjust enrichment related to the Advantage Pacific

21  Collateral and API Collateral, DZ Bank has been damaged in the amount of at least

22  $335,000.00, plus costs.

ORDER- 21

1    23.    The market value estimates are based upon competent evidence, and

2    mathematical certainty is not required.  *Fed. Signal Corp.*, 886 P.2d at 188; *Gaasland Co.*

3    *v. Hyak Lumber & Millwork, Inc*., 257 P.2d 784, 788 (Wash. 1953); *Harmsen*, 693 F.2d

4    at 945.

5    24.    DZ Bank is entitled to judgment in its favor and against Connect Insurance

6    Agency, Inc., a Texas corporation, and Connect Insurance Agency, Inc., a Florida

7    corporation, jointly and severally.  At trial, Connect claimed for the first time that the

8    corporations registered in Texas and Florida are separate corporations.  This argument is

9    waived.  Connect failed to dispute DZ Bank's allegation that Connect is both a Texas

10   corporation and a Florida corporation, which this court adopted in its order on partial

11   summary judgment.  (*See* DZ SJ Mot. at 2:16-21; Connect SJ Resp. at 4-5 (identifying

12   disputed facts), 7:10-11 (acknowledging "DZ Bank's main premise is that Connect [sic] a

13   Texas/Florida corporation purchased the collateral."); SJ Ord. at 2.)  Further, Connect

14   admitted that it "is a citizen of the State of Texas and the State of Florida with [its]

15   principal place of business in Mansfield, Texas, and Royal Palm Beach, Florida."

16   (Pretrial Ord. at 2.)  A party waives or abandons an argument at the summary judgment

17   stage by failing to provide more than a passing remark in support of its position.  (*See* SJ

18   Ord. at 63:15-64:5); *see also John-Charles v. California*, 646 F.3d 1243, 1247 n.4 (9th

19   Cir. 2011) (holding that a party "failed to develop any argument on this front, and thus

20   has waived it"); *Moreno Roofing Co. v. Nagle*, 99 F.3d 340, 343 (9th Cir. 1996) (ruling

21   that counsel's passing remarks on an issue in opposition to summary judgment were

22   insufficient to avoid waiver); *United States v. Kimble*, 107 F.3d 712, 715 n.2 (9th Cir.

1    1997) (deeming an argument "to have been abandoned") where the party fails to

2    "coherently develop[ ]" it in his briefs); *see also United States v. George*, 291 F. App'x

3    803, 805 (9th Cir. 2008) (holding that a party's "failure to adequately develop . . .

4    arguments in his briefs operates as a waiver").

5          25.    DZ Bank is entitled to judgment in its favor and against Connect Insurance

6    Agency, Inc., a Texas corporation, and Connect Insurance Agency, Inc., a Florida

7    corporation, jointly and severally, in the amount of $450,000.00, plus prejudgment

8    interest calculated from January 1, 2011, to the date of entry of judgment at the

9    appropriate statutory rate, *see* RCW 4.56.110(a)(3), which is inclusive of DZ Bank's

10   claims for conversion and unjust enrichment.

11             **III.    CONCLUSION**

12         Based on the foregoing findings of fact and conclusions of law, the court awards

13   judgment in favor of DZ Bank in the amount of $450,000.00, plus prejudgment interest

14   as delineated above.  The court DIRECTS DZ Bank to prepare, serve, and file a proposed

15   form of judgment, including a calculation of the appropriate statutory rate of prejudgment

16   interest, within seven days of the date of this order.

17         Dated this 9th day of May, 2016.

18

19

20                                  _____

21                                  JAMES L. ROBART
                                    United States District Judge

22

ORDER- 23